IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-5050

_____

SIERRA CLUB, ET AL.,

Plaintiffs-Appellees,

versus

MIKE ESPY, in his official
capacity as Secretary of
Agriculture, ET AL.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Eastern District of Texas

_____

(November 15, 1994)

Before HIGGINBOTHAM, JONES, and BARKSDALE, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The district court issued a preliminary injunction barring the Forest Service from conducting even-aged management in any of the four Texas national forests. The injunction was based on the district court's finding of probable success on plaintiffs' claims under two statutes: the National Forest Management Act, 16 U.S.C. §§ 1600-1614, and the National Environmental Policy Act, 42 U.S.C. §§ 4321-4347. The government and the timber industry intervenors bring this interlocutory appeal challenging the district court's order.

We disagree with the district court's insistence that NFMA restricts even-aged management to exceptional circumstances. We

are persuaded that the district court erected too high a barrier to even-aged management. The standard that even-aged management may be used only in exceptional circumstances goes to the heart of the finding by the district court of a likelihood of success on the merits and upsets the delicate balance struck by Congress between friends and foes of this harvesting method. We must vacate the preliminary injunction and remand.

## I.

### A.

The Forest Service of the Department of Agriculture is charged with administering the resources of this country's national forests "for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. § 528. The principles of MUSYA were expressly incorporated into the statutory and regulatory scheme of NFMA. The pressures to enact NFMA came from many sources. On the one hand, there was increasing national concern over the Forest Service's use of clearcutting. On the other hand, Congress felt it necessary to counteract a Fourth Circuit decision which strictly construed the Organic Act of 1897 to effectively prohibit the practice of clearcutting in the national forests. See West Va. Div. of the Izaak Walton League of Am., Inc. v. Butz, 522 F.2d 945 (4th Cir. 1975) (the Monongahela decision). The result was a compromise expressed in a statute repealing the portion of the Organic Act interpreted in the Monongahela decision, Pub. L. No. 94-588, § 13,

2

1976 U.S.C.C.A.N. (90 Stat.) 2949, 2958, yet imposing new procedural and substantive restraints on the Forest Service.

Specifically, NFMA sets forth requirements for Land and Resource Management Plans under which the national forests are managed. The national forests are divided into management units, see 36 C.F.R. § 200.2, and the Forest Service must prepare an LRMP for each unit. An LRMP must "provide for multiple use and sustained yield of the products and services obtained [from units of the National Forest System] . . ., and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness . . . ." 16 U.S.C. § 1604(e)(1). Once an LRMP is in place, the Forest Service can decide to sell timber only after analyzing timber management alternatives and the sale's particular environmental consequences. Site-specific analysis, sometimes referred to as compartment-level analysis, must be consistent with the LRMP. Id. § 1604(i).

Broadly stated, there are two ways to manage a forest's timber resources. The first method is even-aged management. See 36 C.F.R. § 219.3. Even-aged management includes clearcutting, where all the trees are cut down; seed tree cutting, where most of the trees are cut down, leaving only a few to naturally seed the cut area; and shelterwood cutting, where about double the number of trees are left standing as would be under the seed tree method. Even under the least intrusive even-aged management technique, shelterwood cutting, only about sixteen trees per acre remain after a cut. Moreover, under seed tree cutting, the older trees left to

3

naturally seed the cut area are later removed. Even-aged management results in stands of trees that are essentially the same age. Before choosing to clearcut a portion of the forest, the Forest Service must find that clearcutting is the "optimum method" for achieving the objectives and requirements of the LRMP. 16 U.S.C. § 1604(g)(3)(F)(i). Similarly, before choosing to seed tree cut or shelterwood cut, the Forest Service must find that those methods are "appropriate" for achieving the objectives and requirements of the LRMP. Id.

The second method of timber resource management is uneven-aged management, also known as selection management. See 36 C.F.R. § 219.3. Uneven-aged management encompasses both single tree selection and group selection. Group selection involves cutting small patches of trees, while single tree selection involves selecting particular trees for cutting. Uneven-aged management maintains a continuous high-forest cover, and the stands are characterized by a number of differently aged trees.

The process prescribed by NFMA is intertwined with NEPA. NEPA requires federal agencies to prepare a detailed Environmental Impact Statement to be included in every major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C). NEPA is, of course, a procedural statute, mandating a process rather than a result. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989); see Sabine River Auth. v. United States Dep't of Interior, 951 F.2d 669, 676 (5th Cir.), cert. denied, 113 S. Ct. 75 (1992). NEPA regulations are

4

made applicable to NFMA by 16 U.S.C. § 1604(g)(1).  By regulation, the Forest Service has committed to prepare an EIS before adopting an LRMP.  36 C.F.R. § 219.10(b).  Once the Forest Service has adopted an LRMP, its specific actions in implementing that plan will typically be undertaken after preparation of a site-specific Environmental Assessment.  An EA is a concise document that briefly discusses the relevant issues and either reaches a conclusion that preparation of a site-specific EIS is necessary or concludes with a finding of no significant impact, in which case preparation of an EIS is unnecessary.  40 C.F.R. § 1508.9.  A finding of no significant impact is warranted when the Forest Service finds the action is one anticipated in the EIS, consistent with the EIS, and sufficiently explored by the EIS.

Finally, an EA may be tiered to an existing and broader EIS. Id. § 1508.28.  "Tiering refers to the coverage of general matters in broader environmental impact statements . . . with subsequent narrower statements or environmental analyses . . . incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared."  Id. The EAs in this case are tiered to the existing EIS.

B.

On May 20, 1987, the Forest Service's Regional Forester signed the Record of Decision approving the LRMP and the Final EIS for the Texas national forests.  The FEIS examined thirteen alternatives for managing the forests.  Two of the alternatives provided for uneven-aged management of the forests' timber resources and the

5

remainder for even-aged management.  The Forest Service selected an alternative that provided for even-aged management.  On June 8, 1987, the Texas Committee on Natural Resources, TCONR, filed an administrative appeal with the Forest Service challenging both the FEIS and the LRMP.  TCONR also requested a stay of all timber operations under the even-aged management system.

Meanwhile, litigation was pending in federal court.  TCONR, the Sierra Club, and the Wilderness Society had sued the Forest Service claiming, inter alia, that the Forest Service's activities violated the Endangered Species Act.  The district court agreed, finding that even-aged management in the Texas forests jeopardized the red-cockaded woodpecker, an endangered species.  Sierra Club v. Lyng, 694 F. Supp. 1260, 1272-73 (E.D. Tex. 1988).  The district court permanently enjoined even-aged management in the affected areas.  Id. at 1278.  The government appealed the district court's order, and we affirmed in relevant part.  Sierra Club v. Yeutter, 926 F.2d 429, 440 (5th Cir. 1991).

The permanent injunction affected management of approximately one-third of Texas forests.  On April 1, 1989, the reviewing officer hearing TCONR's administrative appeal of the FEIS and the LRMP decided not to rule on the merits of TCONR's challenge, but instead remanded the LRMP for reanalysis.[1]  The reviewing officer

---

[1]     The process of revising the LRMP and preparing a new EIS began in October, 1990.  On September 15, 1994, the Forest Service released a Draft EIS together with a Draft Revised Forest Plan. The Forest Service anticipates that the Final LRMP and EIS will be released in October, 1995.

reasoned that a change affecting one-third of Texas forests affects the level of goods and services that the forests can supply under the current LRMP. Forest Service Decision at 4. The reviewing officer promulgated interim guidelines to govern management of the forests until the Forest Service issued a new LRMP. Id. at 5. These guidelines provide that the appropriate timber management system is to be determined on a site-specific basis. Id. Specifically, even-aged management can be used if the Forest Service determines it to be appropriate to meet the "objectives and requirements" of the existing LRMP. Id. The Forest Service, however, must consider uneven-aged management alternatives during site-specific analysis. Id. at 6. In sum, although the LRMP was remanded for reanalysis, during the interim its "objectives and requirements" remain controlling on compartment-level decisions.

Frustrated by the Forest Service's refusal to rule on the merits of its administrative claim, TCONR, now joined by the Sierra Club and the Wilderness Society (collectively TCONR), turned to federal court to present its challenge to the FEIS and the LRMP. TCONR sought a declaration that the Forest Service's even-aged management practices did not comply with NEPA or NFMA and an injunction against all even-aged management practices. The government moved for summary judgment on TCONR's even-aged claims. The court referred the matter to a magistrate judge. The magistrate found that since the Forest Service had not ruled on the merits of TCONR's claims, she was constrained by the exhaustion-of-administrative-remedies doctrine to presume the validity of the

7

LRMP and the FEIS:  "In that they are barred from directly attacking the 1987 documents, Plaintiffs are also barred from mounting an indirect attack by demonstrating that the EAs used to justify the proposed sales are invalid merely because they are based on the allegedly invalid 1987 documents."  Report and Recommendation of the United States Magistrate Judge 3-4.  The magistrate found the EAs in compliance with both NEPA and NFMA, and on December 11, 1992, issued a report recommending that the district court grant the government's motion for summary judgment.

On January 6, 1993, TCONR filed an "Urgent Motion for Injunction," seeking to enjoin the Forest Service's even-aged management practices, including twelve imminent timber sales. TCONR later dropped the number of challenged sales to nine.  The district court, rejecting the reasoning of the magistrate judge, denied the government's motion for summary judgment and issued a preliminary injunction prohibiting even-aged management in any of the four Texas forests.  Sierra Club v. Espy, 822 F. Supp. 356, 369-70 (E.D. Tex. 1993).

Like the magistrate judge, the district court first addressed the administrative exhaustion requirement.  Unlike the magistrate, however, the court treated the exhaustion requirement as waived, recognizing that TCONR could not force the Forest Service to hear the merits of its appeal of the LRMP and the FEIS.  This waiver, therefore, presented the district court with the contention that the EAs were invalid because the FEIS and the LRMP were invalid. The court, however, did not explore the adequacy of the LRMP or the

8

FEIS; instead, it focused on whether the EAs themselves complied with NEPA and NFMA. The court found they did not. The court reasoned that TCONR was likely to succeed on its NFMA claim because the Forest Service employed even-aged management as the "rule" when, in fact, NFMA "contemplates that even-aged management techniques will be used only in exceptional circumstances." Id. at 363-64. The court also held that TCONR was likely to succeed on its NEPA claims. Specifically, the court found that TCONR likely would demonstrate that the Forest Service had "'swept' some significant environmental considerations and criticisms of its scheduled even-aged management actions 'under the rug,' or failed to give good faith, meaningful consideration to foreseeable, statutorily important, environmental consequences of its planned even-aged logging activities." Id. at 368.

When timber purchaser representatives Texas Forestry Association and Southern Timber Purchasers Council (collectively timber intervenors) learned of the preliminary injunction, they moved to intervene. The district court denied the motion, but we reversed. Sierra Club v. Espy, 18 F.3d 1202 (5th Cir. 1994). The government and the timber intervenors joined in this appeal of the preliminary injunction.

II.

We first determine the precise scope of the injunction. The district court's order appears to enjoin the Forest Service's entire even-aged management agenda; however, it is clear that the

9

court had before it only the nine pending timber sales. TCONR concedes that the injunction, properly read, applies only to the nine sales. In similar vein, we restrict our analysis to the nine sales.

## III.

In order to obtain a preliminary injunction, the moving party must establish, among other things, a substantial likelihood of success on the merits. Lakedreams v. Taylor, 932 F.2d 1103, 1107 (5th Cir. 1991). Here, the district court found that TCONR would likely succeed on its claims that the EAs violated both NEPA and NFMA. The court, however, did not discuss the validity of either the FEIS or the LRMP, to which the EAs are tiered. We similarly focus our analysis on the narrow issues presented by the EAs.

In determining whether the Forest Service complied with NFMA, we ask if its actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[T]he starting point in every case involving construction of a statute is the language itself." Greyhound Corp. v. Mt. Hood Stages, Inc., 437 U.S. 322, 330 (1978) (internal quotation marks omitted). We must give effect to the unambiguously stated intention of Congress. "In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." Crandon v. United States, 494 U.S. 152, 158 (1990). However, an agency's construction of an ambiguous statute it

10

administers will be upheld so long as that construction is reasonable. See Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 842-44 (1984).

IV.

A.

The government challenges the district court's interpretation of NFMA. Specifically, the government argues that the district court erred when it held that even-aged logging practices could only be used in exceptional circumstances. To hold otherwise, the district court reasoned, would violate the statutory provision that requires the Forest Service to use even-aged management only where "such cuts are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource." 16 U.S.C. § 1604(g)(3)(F)(v) (emphasis added); accord 36 C.F.R. § 219.27(c)(6). This duty to protect, the court held, "reflects the truism that the monoculture created by clearcutting and resultant even-aged management techniques is contrary to NFMA-mandated bio-diversity." 822 F. Supp. at 364 (citing 16 U.S.C. § 1604(g)(3)(B)).

The district court's holding that NFMA requires even-aged management be used only in exceptional circumstances is in tension with Texas Comm. on Natural Resources v. Bergland, 573 F.2d 201 (5th Cir.), cert. denied, 439 U.S. 966 (1978) (TCONR I). There we found that Congress, after hearing testimony on both sides of the

11

clearcutting issue, struck a delicate balance between the benefits of clearcutting and the benefits of preserving the ecosystems and scenic quality of natural forests. Id. at 210. Specifically, NFMA "was an effort to place the initial technical, management responsibility for the application of NFMA guidelines on the responsible government agency, in this case the Forest Service. The NFMA is a set of outer boundaries within which the Forest Service must work." Id. We then cautioned the Forest Service that clearcutting could not be justified merely on the basis that it provided the greatest dollar return per unit output; "[r]ather[,] clearcutting must be used only where it is essential to accomplish the relevant forest management objectives." Id. at 212. We concluded by noting that "[a] decision to pursue even-aged management as the over-all management plan under the NFMA is subject to the narrow arbitrary and capricious standard of review." Id.

TCONR I recognized that the Forest Service may use even-aged management as an overall management strategy. That even-aged management must be the optimum or appropriate method to accomplish the objectives and requirements set forth in an LRMP does not mean that even-aged management is the exception to a rule that purportedly favors selection management. Similarly, the requirement that even-aged logging protect forest resources does not in itself limit its use. Rather, these provisions mean that the Forest Service must proceed cautiously in implementing an even-aged management alternative and only after a close examination of

12

the effects that such management will have on other forest resources.

The conclusion that even-aged management is not the "exception" to the "rule" of uneven-aged management is supported by NFMA's legislative history. On three separate occasions, Congress rejected amendments that would have made uneven-aged management the preferred forest management technique. The first occurred during the joint markup sessions of the Senate Committees on Agriculture and Forestry, and on Interior and Insular Affairs. The language rejected by the Committees appeared in a bill introduced by Senator Randolph. The proposed bill would have required that "uneven-aged forest management primarily implemented by selection cutting shall be used in the eastern mixed hardwood forests." S. 2926, 94th Cong., 2d Sess. § 7(a) (1976). Senator Randolph offered this language as an amendment to the Senate bill considered by the Committees as the markup vehicle. Hearing on S. 3091, As Amended, A Bill to Amend the Forest and Rangeland and Renewable Resources Planning Act of 1974, and for Other Purposes, 94th Cong., 2d Sess. 71-76 (1976). The Committees rejected that amendment largely based on the advice of Forest Service Chief McGuire and another professional forester that even-aged management was often environmentally preferable to uneven-aged management. Following his defeat at the committee level, Senator Randolph offered an amendment on the Senate floor to create the same preference for uneven-aged management. The amendment was tabled and thereby defeated. See 122 Cong. Rec. 27625-27 (Aug. 25, 1976). Finally,

13

during the markup sessions before the House Committee on Agriculture, the Committee rejected an amendment offered by Representative Brown, which would have mandated that uneven-aged management dominate eastern national forests. House Comm. on Agric., 94th Cong., 2d Sess., Business Meetings on National Forest Management Act of 1976, at 205-07 (Comm. Print 1976).

TCONR points out that since the Randolph amendments would have required the use of uneven-aged management, they are not relevant on the issue of whether uneven-aged management is preferred. While TCONR correctly distinguishes the district court's holding from Senator Randolph's attempts to bar even-aged management, TCONR fails to persuade on the issue of whether rejection of congressional efforts to restrict even-aged logging sends a legislative message. That no amendment was specifically offered and rejected that proposed a preference for uneven-aged logging does not change the fact that legislators were loath to deprive the Forest Service of the option to select even-aged management. The final outcome of NFMA reflects those concerns. See TCONR I, 573 F.2d at 210 (Congress struck an "extremely delicate balance" between the benefits of clearcutting and the benefits of preserving the ecosystems and scenic quality of natural forests).

Thus, NFMA does not bar even-aged management or require that it be undertaken only in exceptional circumstances; it requires that the Forest Service meet certain substantive restrictions before it selects even-aged management. To be sure, these restrictions reflect a congressional wariness towards even-aged

14

management, constraining resort to its use.  The sluicing effect of the required inquiries might be described as making a decision to employ even-aged management more difficult.  However, it is not a description or characterization of the effects of the required decisional process that we face.  The district court used "exceptional" as a decisional standard--and hence it upset the balance struck.  In fairness, this distinction was far more subtle in the presentation to the district court.

B.

The next issue is whether the Forest Service's timber sale EAs meet NFMA's substantive requirements.  The district court held that since the EAs failed to protect forest diversity and resources, TCONR was likely to succeed on its claim that the Forest Service had impermissibly exceeded the outer boundaries of NFMA.  The district court found the term "protection" unambiguous and held that the Forest Service's failure to consider ecosystems of old growth forests and its express acknowledgement of diminution of some inner forest species as a result of even-aged management meant that the forest resources were not adequately protected.  The government objects to the district court's interpretation which, it argues, affords "something akin to absolute, individualized protection to whatever wildlife are presently inhabiting any given stand of timber."

TCONR does not dispute the government's assertion that NFMA does not mandate status quo protection; rather, it argues that allowing the Forest Service to define the level of protection it

15

affords to forest resources would "obliterate the statute's substantive 'outer boundaries.'" However, TCONR does no more than urge this court to provide a reasonable interpretation of the protective language used by Congress "further illuminated by recourse to the legislative history."[2] This argument does little to lend support to TCONR's contention that we should ignore the Forest Service's interpretation.

The directive that national forests are subject to multiple uses, including timber uses, suggests that the mix of forest resources will change according to a given use. Maintenance of a pristine environment where no species' numbers are threatened runs counter to the notion that NFMA contemplates both even- and uneven-aged timber management. Indeed, NFMA regulations anticipate the possibility of change and provide that "[r]eductions in diversity of plant and animal communities and tree species from that which would be expected in a natural forest, or from that similar to the existing diversity in the planning area, may be prescribed only where needed to meet overall multiple-use objectives." 36 C.F.R. § 219.27(g); see also 16 U.S.C. § 1604(g)(3)(C) (LRMP must ensure research and evaluation of effects of each management system to assure no "substantial and permanent impairment" of land productivity) (emphasis added); 16 U.S.C. § 1604(g)(3)(E)(i) (LRMP must provide that timber be harvested only where "soil, slope, or

---

[2] TCONR also suggests, without citing any authority, that the standard for protection of natural resources is "as they would exist without unreasonable impairment by humans." The language of the statute does not suggest this interpretation, and we do not adopt it.

other watershed conditions will not be <u>irreversibly</u> damaged") (emphasis added).  That protection means something less than preservation of the status quo but something more than eradication of species suggests that this is just the type of policy-oriented decision Congress wisely left to the discretion of the experts-- here, the Forest Service.

The Forest Service's discretion, however, is not unbridled. The regulations implementing NFMA provide a minimum level of protection by mandating that the Forest Service manage fish and wildlife habitats to insure viable populations of species in planning areas.  36 C.F.R. § 219.19.  In addition, the statute requires the Forest Service to "provide for diversity of plant and animal communities."  16 U.S.C. § 1604(g)(3)(B).  This diversity mandate itself has been the subject of considerable debate.  <u>See</u> Final Report of the Committee of Scientists, 44 Fed. Reg. 26599, 26608-09 (1979); Charles F. Wilkinson & H. Michael Anderson, <u>Land and Resource Planning in the National Forests</u>, 64 Or. L. Rev. 1, 290-96 (1985); <u>see also</u> <u>Krichbaum v. Kelley</u>, 844 F. Supp. 1107, 1114-15 (W.D. Va. 1994); <u>Sierra Club v. Marita</u>, 843 F. Supp. 1526, 1532-33 (E.D. Wis. 1994).  The regulations define diversity as "[t]he distribution and abundance of different plant and animal communities and species within the area covered by a land and resource management plan."  36 C.F.R. § 219.3.  At least one court has recognized the difficulty in requiring a precise level of diversity:  "The agency's judgment in assessing issues requiring a high level of technical expertise, such as diversity, must . . . be

17

accorded the considerable respect that matters within the agency's expertise deserve."  Sierra Club v. Robertson, 810 F. Supp. 1021, 1028 (W.D. Ark. 1992), aff'd in part, vacated in part on other grounds, 28 F.3d 753 (8th Cir. 1994).

We need not take this opportunity to define precisely the "outer boundaries" of NFMA's protection and diversity requirements, because we find that the timber sale EAs fall clearly within such boundaries.  Each EA considered no action, even-aged management, and uneven-aged management alternatives.  Although it is true that when all nine sales are taken together even-aged management emerges as the preferred alternative,[3] each sale varies as to the extent of its usage.  For instance, in Compartment 32, forty-six percent of the acres scheduled to be harvested will be harvested using selection management.  The remaining acres will be harvested by seed tree cutting.  In Compartment 98, twenty-three percent of the acres scheduled to be harvested will be harvested using selection cutting.  The remaining acres will be harvested using the seed tree method.  Finally, in Compartment 57, the Forest Service chose to

---

[3]    The following chart details, by compartment, the number of acres to be cut and the timber method employed.

| Compartment | Even-aged Management Seed tree | Clearcut | Uneven-aged Management |
|---|---|---|---|
| 32 | 120 | | 101 |
| 51 | 222 | | |
| 57 | | | 60 |
| 66 | 165 | | |
| 79 | 193 | | |
| 93 | 275 | 27 | |
| 98 | 143 | | 43 |
| 110 | 93 | 14 | |
| 113 | 70 | | |

harvest sixty acres of timber using group selection, an uneven-aged management method. Even this limited interspersing of even- and uneven-aged management helps assure a mix of early and late successional habitats.

Moreover, the EAs do not ignore old growth ecosystems. The Compartment 32 EA, for example, discusses the old growth component of the forest. Compartment 32 contains 964 acres of federal land and approximately 2,000 acres of privately owned land. The EA notes that no stands in the compartment were selected for old growth designation because of the fragmented ownership of the compartment. This determination cannot be said to be arbitrary or capricious.

The EAs also address wildlife habitat concerns. Each EA states that all existing wildlife populations will remain at viable levels, no matter which timber management alternative the Forest Service selects. See 36 C.F.R. § 219.19. They also each list the management indicator species identified in the LRMP and in Appendix D of the FEIS. MIS are representative species used to monitor the overall effects of a timber management alternative. The Forest Service selects MIS based on their susceptibility to changes in timber management. Each EA sets a goal for maintenance of MIS. In Compartment 93, for instance, the Forest Service's goal is to increase the numbers of eastern wild turkey and red-cockaded woodpecker. The Service also must attempt to maintain current levels of white-tailed deer, gray squirrels, fox squirrels, and to maintain viability of pileated woodpeckers, yellow-breasted chats,

19

eastern bluebirds, and six-lined racerunners. Finally, the Forest Service must attempt to maintain or increase the numbers of bobwhite quail.

Given these goals, the Forest Service's selection of an even-aged management alternative in Compartment 93 cannot be said to be arbitrary or capricious. Under the selected alternative, the numbers of fox squirrel and pileated woodpecker decrease. However, other species would increase; namely, white-tailed deer, eastern wild turkey, red-cockaded woodpecker, yellow-breasted chat, eastern bluebird, bobwhite quail, and the six-lined racerunner. Under the selection management alternative, only the pileated woodpecker would increase in numbers. All other listed MIS would decrease, though all existing species would be maintained at viable population levels.

The Forest Service is charged with managing the ever-changing resources of the national forests. In the absence of forest management, trees would grow older, the character of plant and animal diversity would change, and some wildlife species would decline in numbers. Harvesting trees using even-aged management techniques necessarily results in younger stands. Wildlife dependent on younger stands would flourish at the expense of species dependent on older growth forests. Harvesting trees using uneven-aged management techniques results in denser forests. Wildlife dependant on such cover would flourish at the expense of wildlife dependent on forest clearings. These forest dynamics make clear that protecting forest resources involves making trade-offs.

20

We may believe that protection afforded by selection management is more desirable than that afforded by even-aged management; however, in the nine sales before the court, the agency's determination as to the appropriate level of protection was not unreasonable. We therefore defer to the agency's determination. See Chevron, 467 U.S. at 843 & n.11.

V.

The district court also held that TCONR would likely succeed on the merits of its NEPA claim. Specifically, the court held that the EAs did not take a "hard look" at all the forest management alternatives or their environmental consequences.

This court recently reviewed NEPA's requirements in Sabine River Auth. v. United States Dep't of Interior, 951 F.2d 669 (5th Cir.), cert. denied, 113 S. Ct. 75 (1992). There we held that NEPA "is a procedural statute that . . . . does not command the agency to favor an environmentally preferable course of action, only that it make its decision to proceed with the action after taking a 'hard look at environmental consequences.'" Id. at 676 (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989)). Notably, Sabine recognized that while other statutes may impose substantive requirements on an agency, "NEPA merely prohibits uninformed -- rather than unwise -- agency action." 951 F.2d at 676 (internal quotation marks omitted).

An EIS must contain "a detailed statement of the expected adverse environmental consequences of an action, the resource commitments involved in it, and the alternatives to it." Kleppe v.

Sierra Club, 427 U.S. 390, 401-02 (1976). An EA, on the other hand, is prepared in order to determine whether an EIS is required. Sabine, 951 F.2d at 677. An EA is a "rough-cut, low-budget environmental impact statement" intended to determine whether environmental effects are significant enough to warrant preparation of an EIS. Id. (internal quotation marks omitted). An EA must "include brief discussions of the need for the proposal, of alternatives . . ., of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b).

While an EA must contain a discussion of alternatives, the range of alternatives that the Forest Service must consider "decreases as the environmental impact of the proposed action becomes less and less substantial." Olmsted Citizens for a Better Community v. United States, 793 F.2d 201, 208 (8th Cir. 1986) (upholding consideration of a limited range of alternatives when a finding of no significant environmental impact was made). Notably, the district court in Sabine pointed out that "[a]lthough consideration of some range of alternatives is essential to any environmental assessment, it makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined, through its decision not to file an impact statement, will have no significant environmental effects anyway." Sabine River Auth. v. United States Dep't of Interior, 745 F. Supp. 388, 399 (E.D. Tex. 1990) (internal quotation marks omitted), aff'd, 951 F.2d 669 (5th Cir.), cert.

22

<u>denied</u>, 113 S. Ct. 75 (1992). <u>Accord</u> <u>Missouri Mining, Inc. v.</u> <u>Interstate Commerce Comm'n</u>, 33 F.3d 980, 984 (8th Cir. 1994); <u>City</u> <u>of New York v. United States Dep't of Transp.</u>, 715 F.2d 732, 744 (2d Cir. 1983), <u>appeal dismissed</u>, 465 U.S. 1055 (1984).

We disagree with the district court. As we see it, the EAs prepared by the Forest Service for the nine timber sales appear likely to satisfy NEPA's requirements. First, eight of the nine EAs consider four alternatives: a no action alternative, an uneven-aged management alternative, and two even-aged management alternatives. The ninth EA considers the four above alternatives and an additional uneven-aged management alternative. The EAs also discuss the need for the proposal, the agencies and persons consulted, and the environmental effects of each alternative, including the effects each alternative would have on wildlife, vegetation, soils, water, air, recreation, and cultural resources. The EAs examine the mitigating measures that would be taken with each alternative, as well as the social and economic factors affecting each alternative.

When evaluating whether an EA complies with NEPA, we must be careful to avoid confusing NEPA's requirements for an EIS with those for an EA. This case is unique because the LRMP has been remanded for reanalysis and harvest-method decisions are to be made on a compartment-level basis. However, this fact affects the NFMA analysis more than the NEPA analysis. The EAs in this case remain "rough-cut, low-budget" documents that are tiered to the FEIS and that incorporate the still-relevant objectives and requirements of

23

the LRMP.  When examined under this light, we conclude that the EAs adequately address the need for the proposal, the alternatives, the environmental consequences, and the agencies and persons consulted.

## VI.

We conclude that the district court erred in granting the preliminary injunction.  We VACATE AND REMAND.