Sharron **STEWART** et al., Plaintiffs,

v.

Eric **POTTS**, District Engineer, U.S. Army Corps of Engineers et al., Defendants.

No. Civ.A. G-96-282.

United States District Court,
S.D. Texas,
Galveston Division.

Dec. 15, 2000.

James B Blackburn, Jr, Blackburn & Carter, Houston, TX, Richard Roberts Morrison, Iv, Blackburn and Carter, Houston, TX, for Sharron Stewart, Houston Audubon Society, Sierra Club, plaintiffs.

Albert C Lin, US Department of Justice, Environment & Natural Resources, Washington, DC, for Robert B Gatlin, District Engineer, defendant.

Lois J Schiffer, Assist. Atty. Gen., Environment and Natural Resources Div., Donna Fitzgerald, Washington, DC, Mellie M Billingsley, U.S. Army Corps. of Engineers General counsel, Galvston, TX, Albert C Lin, U.S. Dept. of Justice, Environment & Natural Resources, Washington, DC, for Togo D Togo D. West, Jr., Acting Secretary, Department of the Army, Jr, defendant.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

Plaintiffs Sharron Stewart, Houston Audubon Society, and the Sierra Club bring this action against the United States Army Corps of Engineers ("Corps"), Colonel Eric R. Potts in his official capacity as District Engineer of the Corps, and Togo D. West in his official capacity as Secretary of the Department of the Army (collectively, the "Federal Defendants"). Plaintiffs seek injunctive and other relief pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706, the Clean Water Act, 33 U.S.C. § 1251 et seq., and the Declaratory Judgment Act, 28 U.S.C. § 2201, for violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., and the Clean Water Act.[1] Now before the Court are the Federal Defendants' Motion for Summary Judgment, filed on September 26, 2000 and the Plaintiffs' Motion for Summary Judgment, filed on October 23, 2000. For the reasons stated below, Plaintiffs' Motion for Summary Judgment is **DENIED**, while Defendants' Motion for Summary Judgment is **GRANTED**.

## I. FACTUAL SUMMARY

This litigation arises over the Corps' issuance, under Section 404 of the Clean Water Act, of Permit No. 20271 to the City of Lake Jackson to construct a golf course. The golf course as proposed will be constructed on a 200–acre tract of forest and wetlands adjacent to the Brazos River near the Gulf of Mexico in Lake Jackson, Brazoria County, Texas. In 1979, the City of Lake Jackson ("City") created a comprehensive development plan, which included plans for a public golf course. Ten years later, the City purchased a 400–acre tract of land, located within its extraterritorial jurisdiction, for the purpose of constructing the golf course. The City then began implementing the procedures necessary to approve the construction of the golf course.

In November of 1990, the City requested that the Corps make a jurisdictional

1. The Plaintiffs' claims arising under the citizen suit provision of the CWA, section 505(a)(1), 33 U.S.C. § 1365(a)(1), and the federal mandamus provision, 28 U.S.C. § 1361, were dismissed with prejudice by Order of the Court entered October 30, 1997.

determination of the 400–acre tract. At the outset, the Corps identified a large area of wetlands concentrated on the lower 200 acres of the tract. Following this identification, the City scaled down the golf course design, deciding to build an eighteen-hole course rather than a thirty-six hole course, so as to avoid impacting the substantial wetlands on the lower 200 acres.

The upper 200 acres of the tract are part of a 1,200 contiguous acre parcel of bottomland hardwoods forest. In December of 1992, the City submitted a delineation of this tract to the Corps, with its own assessment that the property contained 7.15 acres of jurisdictional wetlands. Disagreeing with this number, the Corps conducted intensive redelineation in consultation with the U.S. Department of Agriculture's Natural Resource Conservation Service and ultimately determined that the upper 200–acre tract contained 24.34 acres of jurisdictional wetlands. Abiding by the Corps' determination, the City then redesigned its golf course, avoiding all but approximately two acres of scattered "fringe" wetlands. The impacted wetlands range in size from a couple of feet in diameter to less than one-quarter of an acre each.

In conducting its delineation of the jurisdictional wetlands, the Corps worked extensively with the Environmental Protection Agency ("EPA") and the U.S. Fish and Wildlife Service ("FWS"). The Corps also enlisted the aid of the U.S. Department of Agriculture to participate in field investigations of the wetland soils. The Corps invited the EPA and the FWS to attend a delineation verification on June 21, 1994, at which time the EPA and the FWS agreed that the Corps' delineation methods were sound. However, the representative from the FWS indicated that he might have concerns about the delineation process if the City applied for a permit, due to a need for more information. Thereafter, on June 28, 1994, the Corps submitted the delineation to the EPA, which is the agency charged with oversight of the section 404 program, for approval. On August 24, 1994, the EPA concluded that the Corps' determination represented "a reasonable interpretation of the geographic extent of jurisdictional waters of the United States including wetlands." The EPA further affirmed that the Corps' case-specific determination would represent the Government's position in any subsequent federal action or litigation regarding the case. The EPA concluded that the 200–acre site is clearly typical of a floodplain forest and not a "wetland per se."

Following the completion of the Corps' jurisdictional determination process, the City presented its redesigned plans for the golf course to the Corps, and applied for a permit on February 8, 1995. A public notice regarding receipt of the application and a request for public comments were issued by the Corps on March 27, 1995. Comments were received from the EPA and FWS, in addition to several citizens. The EPA raised concerns about the impacts to the habitat of neotropical migratory birds, secondary and indirect impacts to the wetland areas, and the investigation of less environmentally damaging practicable alternatives. The EPA also recommended that the Corps further examine the data used in delineation because of concerns raised by the FWS. Because of its concerns and its conclusion that impacts to wetlands would be considerable, the EPA recommended that the permit not be issued as proposed.

The FWS also responded to the Public Notice, and it too recommended that the permit not be issued as proposed. The FWS voiced concerns similar to those of the EPA, including degradation of wetlands and bottomland hardwood forest without mitigation, potential impacts on native wildlife species such as neotropical migratory birds, failure to consider practicable alternatives, in addition to concerns about sheetflow alterations.

The Corps complied with the EPA's recommendation that it reconsider its jurisdictional determination by considering

the FWS data cited by the EPA, but determined that the data did not warrant reevaluation of the jurisdictional determination. The EPA concurred in that determination. With regard to the EPA and FWS's concerns regarding impacts of the project to hardwood forest areas and migratory birds, the Corps declined to consider such impacts, contending that upland forest areas are not within the Corps' jurisdiction. The Corps also declined to consider alternative sites outside of the City's territorial jurisdiction, because it found that those sites would not serve the project's purpose of constructing a golf course in Lake Jackson.

Upon evaluating all of the public comments it received, the Corps made a finding that the proposed project's potential for environmental impact would not be significant, and therefore did not prepare an EIS. It also found that there were no practicable alternative sites, and that the project's potential impacts had been avoided or minimized to the maximum extent practicable. Accordingly, the Corps granted the section 404 permit on February 12, 1996.

Pursuant to standard policy, the FWS referred the grant of the permit to the Assistant Secretary of the Army for Civil Works, who reviewed FWS's concerns and conducted a separate investigation. The Assistant Secretary agreed with the Corps' jurisdictional determination, and with the Corps' conclusions that the impacts to the jurisdictional wetlands would be insignificant and the mitigation requirements would be adequate. On May 20, 1996, the Plaintiffs filed the present action, challenging the issuance of Permit No. 20271 to the City of Lake Jackson.

The parties filed cross-motions for summary judgment on December 29, 1997. Shortly thereafter, on March 6, 1998, the Court entered an order disposing of several of Plaintiffs' claims in favor of Defendants.[2] However, the Court ruled in favor of Plaintiffs regarding the Corps obligation to consider "the cumulative and indirect effects" of fragmentation of upland forest on "migratory birds and wildlife." *Stewart v. Potts*, 996 F.Supp. 668, 680, 685–86 (S.D.Tex.1998). The Corps had contended that it lacked jurisdiction to consider the impacts of such upland forest fragmentation. *See id.* at 680. The Court determined that the Corps was required to conduct an analysis of these effects for two reasons. First, the Court determined that the Corps had jurisdiction to consider the cumulative impact of forest fragmentation essentially because the relevant trees were part and parcel of the wetlands area being evaluated. *See id.* at 681–83. Second, the Court ruled that the Corps had a responsibility to consider the effect of upland forest fragmentation as part of its overall cumulative impacts analysis. *See id.* at 683–84. In light of its rulings, the Court ordered that the case be administratively closed while the Corps conducted the further mandated analyses and granted Plaintiffs leave to move to reopen the case following the Corps' review "solely for further APA review of the remanded claims." *Id.* at 686.

On remand, the City of Lake Jackson hired a consultant to prepare a study aimed at addressing the deficiencies identified by this Court in its March 6, 1998 Order. The City's consultant completed its work in August 1999 and submitted its report to the Corps. This review determined that the golf course project left adequate forested habitat for native and migratory species and thus did not threaten any significant cumulative impact. The 154 acres of trees that would be felled to construct the golf course would amount to a 0.006% reduction in present forest within a four-county area. According to the consultant's study, some bird species could experience a "localized" population decline, but that nevertheless, no irreparable harm would be had in the overall area. The

---

2. The Court will not restate the disposition of the various claims herein, but refers the read-

er to *Stewart v. Potts*, 996 F.Supp. 668 (S.D.Tex.1998).

Corps considered the consultant's report and determined that neither it, nor any other "new evidence," would support the need for an EIS or a reversal of the Corps' original decision to grant the permit. Therefore, after preparing a "Supplement to Environmental Assessment/Statement of Findings" dated November 1, 1999, the Corps reissued Permit No. 20271 on November 29, 1999. The Corp later suspended this permit, briefly, upon learning of Plaintiffs' various concerns, and that Plaintiffs intended to move to reopen the case in this Court. During this suspension period, the Corps arranged for an ecologist from another Corps' district to evaluate the available information. This reevaluation again concluded that no significant impact would be had on the human environment. Therefore, on May 8, 2000, the Corps reinstated the Permit.

Plaintiffs filed their Motion to Reopen Case on May 30, 2000 alleging that the Corps had: (1) conducted an inadequate analysis of cumulative impacts; (2) exhibited bias; (3) failed to properly circulate the revised cumulative impact analysis to other government agencies; and (4) improperly failed to perform an environmental impact statement. On May 31, 2000, the Court entered an order reopening the case. Now before the Court is Defendants' Motion for Summary Judgment on the Reopened Claims, filed September 26, 2000, and Plaintiffs' Cross Motion for Summary Judgment, filed October 23, 2000.

## II. ANALYSIS

### A. *The National Environmental Policy Act*

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, requires federal agencies to prepare an environmental impact statement ("EIS") to be included in every major Federal action

that "significantly" affects the quality of the human environment. 42 U.S.C. § 4332(2)(C). The issuance of a section 404 permit by the Corps of Engineers is deemed to be a "major Federal action" to which NEPA's mandates apply. *See Sierra Club v. Sigler,* 695 F.2d 957, 964 (5th Cir. 1983).[3] NEPA is a procedural act, mandating a process rather than a result. *See Sierra Club v. Espy,* 38 F.3d 792, 796 (5th Cir.1994). NEPA does not require that an agency select an environmentally favorable course of action, but only that the agency make its decision to proceed with a particular action after taking a "hard look" at the potential environmental consequences. *Sabine River Auth. v. United States Dep't of Interior,* 951 F.2d 669, 676 (5th Cir. 1992) (quoting *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989)). NEPA prohibits uninformed, not unwise, agency actions. *See Sabine River,* 951 F.2d at 676.

Not every "major Federal action," however, requires the preparation of an EIS. Thus, in order to determine whether an EIS is required, an agency usually prepares an environmental assessment ("EA"), which is a rough, less detailed statement intended to determine whether environmental impacts are significant enough to require an EIS. *See Espy,* 38 F.3d at 802. If the EA concludes that the action will have no significant impact on the quality of the human environment, no EIS is required. *See id.* at 796. The agency then issues a "Finding of No Significant Impact" ("FONSI"). *See* 40 C.F.R. §§ 1508.9, 1508.13.

### B. *Standard of Judicial Review*

In the absence of a statutory review standard, the Court must look to the standard established by the Administrative

---

**3.** A non-federal activity becomes a federal action requiring NEPA analysis if it cannot "begin or continue without prior approval of a federal agency." *Maryland Conservation Council, Inc. v. Gilchrist,* 808 F.2d 1039, 1042 (4th Cir.1986) (citing *Biderman v. Morton,* 497 F.2d 1141, 1147 (2d Cir.1974) and *Foundation on Econ. Trends v. Heckler,* 756 F.2d 143, 155 (D.C.Cir.1985)).

Procedure Act ("APA"), 5 U.S.C. § 706. *See Sierra Club v. Glickman,* 67 F.3d 90, 96 (5th Cir.1995). Except for agency actions that are adjudicatory in nature, the APA provides that agency actions shall not be set aside unless found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). In this inquiry under the APA, the Court is limited to consideration of the evidence contained in the administrative record; a *de novo* review is improper. *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

The APA's "arbitrary and capricious" standard of review is very narrow, and mandates judicial deference to conclusions and actions of the agency. "Under this standard, administrative action is upheld if the agency has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Glickman,* 67 F.3d at 97. While the reviewing Court must make a careful and searching inquiry into the facts, the Court may not substitute its own judgment for that of the agency. The agency's decision need not be ideal, as long as it is not arbitrary and capricious, and the agency gave at least minimal consideration to the relevant facts contained in the record. *See Louisiana ex rel. Guste v. Verity,* 853 F.2d 322, 327 (5th Cir.1988).

In reviewing the agency's scientific factfindings, the Court must be especially deferential. *See Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983). "We must look at the decision not as the chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." *Ethyl Corp. v. Envtl. Protection Agency,* 541 F.2d 1, 36 (D.C.Cir.1976) (en banc) (footnote omitted). The Corps must be allowed discretion to rely on the reasonable opinions of its own qualified experts even though the Court might find contrary views more persuasive. *See Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989).

It is within the confines of this narrow standard that the Court must consider the summary judgment motions now presented. Of course, summary judgment is appropriate only if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56. A fact is material if its resolution in favor of one party might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should not be granted if the evidence indicates that a reasonable factfinder could find in favor of the non-moving party. *See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

*C. Bad Faith*

As discussed, a court conducting APA review of an agency determination ordinarily is limited to the reviewing only the administrative record. *See Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985); *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). In rare instances, however, a court may go beyond the administrative record and conduct an "extra record investigation." *National Audubon Soc'y v. Hoffman,* 132 F.3d 7, 14 (2d Cir. 1997); *accord In re F.D.I.C.,* 58 F.3d 1055, 1062 (5th Cir.1995). One way a plaintiff may secure such extra record inquiry is by arguing that agency decision makers engaged in bad faith or improper behavior. *See Hoffman,* 132 F.3d at 14. However, in order for a court to undertake this more searching inquiry, the plaintiff must make a "strong showing in support of a claim of bad faith or improper behavior." *Hoffman,*

132 F.3d at 16; *accord In re F.D.I.C.,* 58 F.3d at 1062. The decision whether to allow such extra record investigation rests within the sound discretion of the district court. *See Hoffman,* 132 F.3d at 16; *In re F.D.I.C.,* 58 F.3d at 1062.

Plaintiffs allege that the Corps exhibited bad faith, pointing to a meeting that occurred on July 19, 1999, at which the draft supplemental environmental assessment prepared by the consultants was discussed. Present at this meeting were the cumulative impact consultants, various City officials, and Corps personnel. The draft supplemental environmental assessment under consideration apparently contained the words "significant" and "substantial" with reference to various impacts of the proposed golf course project. However, the final supplemental environmental assessment did not contain the word "significant." Plaintiffs contend that the discussion at this meeting focused upon the removal of the terms "significant" and "substantial" from the consultants reports. According to Plaintiffs, this discussion indicates possible bad faith by the Corps in that the Corps allegedly was more concerned with removing these words from the report than with preserving the scientific integrity of the consultants' reports.

 The Court rejects Plaintiffs' contention that these facts, even when viewed in the most sinister light, suffice to make the requisite strong showing of bad faith. Initially, the Court notes that a government agency must be permitted to explain the legally operative meaning of any words to its employees or consultants. It is axiomatic that what is significant to one scientist may not be significant to all. *See Fritiofson v. Alexander,* 772 F.2d 1225, 1236 (5th Cir.1985).[4] The Federal Regulation applicable to the Corps' analysis sets forth an extensive explanation of what "significantly" means under the federal en-

vironmental laws. *See* 40 C.F.R. § 1508.27. To prohibit legal vocabulary education would not serve to further crucial agency decisionmaking processes, but rather would confound the efforts of agencies to make determinations in light of the applicable law. As the *Fritiofson* court observed, it "is readily apparent, the [the] decision whether to prepare an EIS may turn in large part on the definition of the term significantly." *Id.* The Corps may quite rightly explain this legally operative word to its scientists and consultants. Thus, while the consultant's report may have ultimately omitted any reference to "significant," it seems indisputable that the Corps did not exercise any form of unduly coercive influence over these individuals.

The Plaintiffs have failed to make a "strong showing of bad faith." *See Hoffman,* 132 F.3d at 14. The Court must, therefore, reject Plaintiffs' request to conduct extra record discovery to supplement the record. *See In re F.D.I.C.,* 58 F.3d at 1062. This determination mandates that the Court not go beyond the administrative record. *See Hoffman,* 132 F.3d at 16. As the administrative record does not indicate bad faith on the Corps' part, Defendants' Motion for Summary Judgment on the Plaintiffs' bad faith allegations is **GRANTED.** Plaintiffs' claim is hereby **DISMISSED WITH PREJUDICE.**

### D. *Cumulative Impacts*

Plaintiffs characterize the Corps' analysis of cumulative impacts as the "pivotal issue in this case." The Court agrees. The Corps' prior failure to perform a cumulative impact study on the effects of upland forest fragmentation was the precise reason the Court previously remanded this matter for further study and consideration. Moreover, as the parties recognize, the disposition of this issue effectively determines whether or not the Corps properly

4. The *Fritiofson* case was overruled in part by *Sabine River Authority v. United States Dep't of Interior,* 951 F.2d 669 (5th Cir.1992). Sabine River, however, only overruled *Fritiofson* on the standard of judicial review employed not on any of the grounds discussed by the Court in this Order.

decided not to issue an EIS for this project.

As discussed in Part I.A. above, NEPA requires the Corps to determine if the golf course project necessitates the preparation of an EIS. In order to determine the need for an EIS, the Corps, as is typically done, prepared an EA. This EA concluded that no "significant impact" would be had on the quality of the human environment. *See Espy*, 38 F.3d at 796. Absent a "significant impact," NEPA does not mandate that the Corps undertake an EIS. *See id.* Part of the Corps' preliminary EA inquiry under NEPA requires it to engage in a cumulative impacts analysis. The CEQ regulations define cumulative impact as:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

The regulations "clearly mandate consideration of impacts from actions that are not yet proposals and from actions—past, present, or future—that are not themselves subject to the requirements of NEPA." *Fritiofson*, 772 F.2d at 1243. The parties do not dispute this general principle. Rather the crux of the dispute involves the manner in which the Corps must conduct this inquiry. Plaintiffs argue that the regulation, by its terms, requires a fairly mechanistic approach to evaluating cumulative impacts. They contend that the Corps should have evaluated the impact of the present action after the Corps has literally quantified the total impact of past, present and future actions.

Initially, Plaintiffs' argument has a certain appeal to it. The regulation does state that the present incremental impact is to be "added" together with other effects to evaluate the cumulative effect of going forward with the present project. *See* 40 C.F.R. § 1508.7. Plaintiffs use the year 1979 as a baseline. In 1979 there were 305,914 acres of forested Columbia Bottomlands. By 1995, this number had fallen to 254,269 acres, a decrease of 51,645 acres, which represents the past loss of forest. Plaintiffs then add the present impact of 154 acres to the 51,645 acres and attain a total cumulative impact of 51,799 acres. According to Plaintiffs, the Corps was required to have calculated a 16% decrease, based upon the 51,799 lost acres. By contrast, the Corps uses a "baseline" of 238,129 acres of forest, which is the estimated current forest acreage. The Corps then assessed the present loss of forest *vis-a-vis* this already reduced baseline, which results in a calculated 0.006% decrease based upon the 154 acres to be removed.[5]

Undisputably, the Corps did not do what Plaintiffs argue the Corps should have done. Moreover, it is also beyond dispute that Plaintiffs' method of calculating forest loss will, as a practical matter, always lead to a larger percentage number than will the Corps' method in any case in which a portion of the relevant forest area has previously been felled. The problem with Plaintiffs' argument, however, is that the law does not require the Corps to take this precise approach, or any specific approach. Instead, the Fifth Circuit has set forth

**5.** There is at least some support in the law for the Corps' method of analysis. *See Sierra Club v. United States Forest Serv.,* 46 F.3d 835, 839 (8th Cir.1995). In this case, the Sierra Club contended that the Forest Service had not adequately assessed the impacts of previous timber sales in the Service's Environmental Assessment of its forest management plan. *See id.* The Forest Service of course disagreed. *See id.* And although it is unclear whether the court was merely stating the Forest Service's position, or in fact agreeing with the Service, the Court wrote that "[t]he EA did incorporate the impacts of previous timber sales … because the timber clearing was completed before the existing conditions in Victoria were assessed." *Id.* At a minimum, the court implicitly declined to fault this type of analysis.

several factors that must be identified by a meaningful cumulative-effects study:

> (1) the area in which effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*Fritiofson,* 772 F.2d at 1245.

 Plaintiffs focus upon the allegedly faulty quantitative analysis undertaken by the Corps and suggest that this analysis belies the Corps' claim that it undertook an acceptable cumulative impacts analysis. However, Plaintiffs miss the point. The percentage reduction in forest, however calculated, does not alone determine whether or not there has been a "significant impact" requiring an EIS. It seems apparent to the Court that in some cases 0.006% may be significant, while in other cases 16% might be insignificant. The controlling question focuses on impact, as determined by a biologist, ecologist, or other specialist of whatever ilk of "ist" discipline. The Corps' scientific consultants determined that the forest fragmentation caused by the proposed golf course, when considered together with other past, present and future impacts, would not have a significant impact on neo-tropical migratory birds or wildlife generally. If all the Corps had done was state that only 0.006% of the forest will be removed, and that such is not significant, Plaintiffs might have a winning argument. However, this case is not an example of a government agency making a mere conclusory assertion of no significant impact. Here, the Corp gathered data, conducted an analysis and came to a conclusion. Moreover, the Corps' supplemental study does set forth the facts that Plaintiffs imply have not been examined, such as the historical decline in local forest acreage, along with the small number of large remaining contiguous stands of forest. By contrast, however, the report also observes that migrating birds only remain in the area for brief periods of time, and in lay terms, don't seem to be highly particular about the vegetation into which they "fall out." The administrative record in this case contains a wealth of information, from which any number of conclusions might have been drawn. Based upon this record, the Corps' scientists determined that the cumulative impact data indicated that no significant impact would be had. The Corps' study complies with the *Fritiofson* requirements, and the Court declines to second guess the decisions of these expert scientists as embodied in the Corps' report. *See Baltimore Gas & Elec.* 462 U.S. at 103, 103 S.Ct. at 2255. The manner in which the Corps came to its conclusion cannot be seen as an abuse of discretion, and accordingly Defendants' Motion for Summary Judgment on the Plaintiffs' cumulative impact complaint is **GRANTED.** Plaintiffs' claim is hereby **DISMISSED WITH PREJUDICE.**

### E. *Coordination with Other Government Agencies*

The Corps is required to consider the comments of other agencies in evaluating a particular proposal. *Stewart,* 996 F.Supp. at 678. The Corps must undertake this consultation with other agencies before preparing its EA. *See Fritiofson,* 772 F.2d at 1236. Under the arbitrary and capricious standard of review, however, the Corps "is entitled to rely completely upon its own experts 'even if the reviewing court finds the opinions of other experts equally or more persuasive.' " *Stewart,* 996 F.Supp. at 678 (quoting *Sabine River Auth. v. United States Dept. of Interior,* 951 F.2d 669, 678 (5th Cir.1992)). Plaintiffs criticize the Corps for an alleged failure to re-engage in discussions with the Fish and Wildlife Service ("FWS") when conducting its review on remand. The Corps disagrees with Plaintiffs contention that the law re-

quires an agency to undertake further consultations following a remand, but points to the record indicating that it nevertheless sought further input from the FWS, as well as Plaintiffs, while conducting its study on remand.

On the legal issue, the Corps relies upon *Sierra Club v. United States Army Corps of Eng'rs*, 935 F.Supp. 1556 (S.D.Ala.1996) ("Alabama Case") as supporting the argument that it had no legal obligation to consult with the FWS on remand. The Alabama Case, however, presents a slightly different factual situation, than the present scenario. In the Alabama Case, the Corps had previously consulted with FWS on a larger scale version of the project at issue, and recognized the FWS's concerns. *See id.* at 1580–81. Thereafter, the project's scope diminished, and as this could only have lessened the FWS's concerns that had already been examined, the Corp decided not to further consult the FWS. *See id.* Moreover, the court in the Alabama Case, noted that the FWS had not elevated the dispute to its national office as apparently occurred in the dispute now before this Court. *See id.* at 1580. By contrast, in the present dispute, the Court remanded the case to the Corps because it had *never* analyzed the cumulative impact of deforestation on neo-tropical migratory birds, instead having disclaimed any jurisdiction to undertake such analysis. Thus, the Corps cannot simply fall back blindly on earlier discussions with FWS as a justification for not undertaking further discussion of the impact of forest fragmentation on wildlife.

▉ Thus, assuming, without deciding, that the Corps had to undertake further communications with FWS the Court simply notes that the Corps in fact did so. The Corps' consultants sought and received input from FWS on the cumulative impact of this project on bird life. Moreover, the Corps began its remand inquiry fully apprised of both FWS' and Plaintiffs' scientific objections regarding the disputed impact on migrating birds. Although communications with FWS may have been minimal on remand, they were nonetheless sufficient to satisfy the Corps obligation. NEPA only requires the Corps to "give serious consideration to the views expressed by FWS." *Texas Committee on Natural Resources v. Marsh*, 736 F.2d 262, 268 (5th Cir.1984). The Corps' pre-existing knowledge of FWS' and Plaintiffs' concerns and objections, in combination with requests for information on remand, fulfilled the Corps consultation obligation. Therefore, the Corps did not abuse its discretion in not undertaking a full-blown re-consultation with the FWS, and accordingly Defendants' Motion for Summary Judgment on the Plaintiffs' charge of inadequate consultation is **GRANTED**. Plaintiffs' claim is hereby **DISMISSED WITH PREJUDICE**.

F. *Failure to Prepare an Environmental Impact Statement*

Following the preparation of an EA, one of two findings may be reached. *See Fritiofson*, 772 F.2d at 1236. The agency could find that because of "significant" environmental impacts, an EIS must be prepared. *See* 40 C.F.R. §§ 1501.4(c)–(e); 33 C.F.R. § 230.10. Alternatively, the agency might issue a FONSI, determining that the proposed action will have no "significant effects on the environment." *See* 40 C.F.R. §§ 1501.4(c)–(e), 1508.13; 33 C.F.R. §§ 230.10–11. The Court previously remanded this matter to the Corps for it to examine the cumulative impacts of forest fragmentation.

The Court above determined that the Corps adequately performed the requisite cumulative impacts analysis. The lack of such analysis was the only basis with which the Court took issue with the Corps prior to remand. As discussed, the Corps has now addressed the Court's concern and performed its responsibility. *See* Discussion Section II.D. As such, the Court cannot say that the Corps has abused its discretion by issuing a FONSI in this case. Defendant's Motion for Summary Judge-

ment is therefore **GRANTED.** Plaintiffs' claim that a the Corps abused its discretion by issuing a FONSI is hereby **DISMISSED WITH PREJUDICE.**

### III. CONCLUSION

For the reasons discussed above, the Court hereby **ORDERS** that Plaintiffs' Motion for Summary Judgment is **DENIED.** Conversely, the Court **ORDERS** that Defendants' Motion for Summary Judgement is **GRANTED.**

**IT IS SO ORDERED.**