**GEORGIA RIVER NETWORK** and Altahama Riverkeeper,
Plaintiffs,

v.

**U.S. ARMY CORPS OF ENGINEERS,** Robert B. Flowers, Commander and Chief of Engineers, U.S. Army Corps of Engineers, Roger A. Gerber, Colonel, U.S. Army Corps of Engineers, Savannah District, and Henry County Water and Sewerage Authority, Defendants.

No. CIV.A. 1:03–CV–0185–JTC.

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 8, 2003.

Ciannat Howett, Southern Environmental Law Center, Julie Virginia Mayfield, Atlanta, GA, J. David Farren, PhV, Southern Environmental Law Center, Chapel Hill, NC, for Plaintiffs.

Patricia Rebecca Stout, Office of United States Attorney Northern District of Georgia, Atlanta, GA, for Defendants.

Patricia T. Barmeyer, Randall J. Butterfield, King & Spalding, Atlanta, GA, A. J. Welch, Jr., Smith Welch & Brittain, McDonough, GA, for Proposed Intervenor.

### ORDER

CAMP, District Judge.

This case is before the Court on the following motions: Plaintiffs' Motion for a Preliminary Injunction [# 2–1]; Plaintiffs' Motion for a Temporary Restraining Order [# 10–1]; Intervenor's Motion to Partially Dismiss Plaintiffs' Complaint [# 30–1]; Intervenor's Motion for Expedited Briefing on the Preliminary Injunction Motion [# 31–1]; Plaintiffs' Motion for Summary Judgment [# 42–1]; Intervenor's Motion for Leave to File a Post Argument Memorandum [# 56–1]; and Defendant's Motion to File in Excess Pages [# 59–1].

Plaintiffs contend Defendant U.S. Army Corps of Engineers ("Corps") violated the National Environmental Policy Act and the Clean Water Act when it issued a Section

404 permit to Defendant–Intervenor Henry County Water and Sewerage Authority ("HCA") for the construction of a reservoir on the Tussahaw Creek without preparing an Environmental Impact Statement ("EIS"). The Corps' decision, however, that the environmental consequences of the action are not sufficient to require an EIS is not arbitrary or capricious. Plaintiffs' Motion for a Preliminary Injunction [# 2–1], Motion for a Temporary Restraining Order [# 10–1], and Motion for Summary Judgment [# 42–1] are **DENIED.**

Intervenor's Motion to Partially Dismiss Plaintiffs' Complaint [# 30–1] is also **DENIED,** and Intervenor's Motion for Expedited Briefing on the Preliminary Injunction Motion [# 31–1] is **DENIED as moot.** Intervenor's Motion for Leave to File a Post Argument Memorandum [# 56–1] and Defendant's Motion to File in Excess Pages [# 59–1] are **GRANTED nunc pro tunc.**

The Court makes the following findings of fact and conclusions of law.

## I. BACKGROUND

### A. The Proposed Reservoir

The proposed Tussahaw Creek Reservoir ("Reservoir") is to be located in Butts and Henry Counties, Georgia. Vol. I at 369. The Reservoir will impound the Tussahaw Creek, a tributary to the Ocmulgee River,[1] located approximately five miles upstream from another artificial lake created in 1910 by Lloyd Shoals Dam for Georgia Power's Jackson Lake hydropower facility. Vol. XII at 6848, 6855. In the course of construction, approximately 30,-000 cubic yards of fill material will be deposited into the waters of the United States, in order to create a reservoir with the surface area of 1,477 acres. Vol. V at

2504. The Clean Water Act requires that the Corps issue a permit (known as a Section 404 permit) before the fill material can be deposited into the Tussahaw. 33 U.S.C. § 1344.

Currently, significant competition exists between local governments in northern Georgia to obtain Section 404 permits for reservoirs. Forty-two other reservoir actions in Georgia are either permitted, pending, in the pre-application stage or temporarily withdrawn due to insufficient data. Vol. XII at 6848. In this regard, the Corps made the following observations:

There is competition for water resources between agricultural areas and the north Atlanta metropolitan urban areas....The most important issue for the State of Georgia at this time may be how to manage the state's surface and ground water resources to satisfy the need for adequate water supply by the competing users....The result of the fragmentation of applications for CWA Section 404 permits, from any existing watershed plan, results in CWA permitting on a "first come, first serve" basis and a race for permits by those counties in north Georgia.... Vol. XII at 6847–48.

HCA seeks to construct the Reservoir to provide an adequate water supply to the residents of Henry County. Vol. V at 2509. From 1990 until 2000, Henry County's population increased by 103%. *Id.* As the third fastest growing county in the United States, Henry County will exhaust its current water supply by 2004. The Reservoir is expected to yield 23.6 million gallons of water per day. Vol. V at 2509; Vol. VIII at 446; Vol. XII at 6813. This will provide an adequate water supply to

---

1. All references to the administrative record, which encompasses fourteen volumes, will be referred to as "Vol. ___ at page number."

the residents of the County until 2016. Vol. XII at 6813.

Downstream from the Reservoir and Lloyd Shoals Dam, the Ocmulgee River joins with the Oconee to form the Altahama River. Vol. XII at 6848, 6855. In 2002, the American Rivers Organization named the Altahama as one of the healthiest rivers on the eastern seaboard but also one of the most at risk because of the proliferation of reservoirs. The American Rivers Organization's concern is that the reservoirs will reduce the flow of water into the Altahama, which may induce a "perpetual drought" condition in the Altahama. The result would be increased salinity from the decreased fresh water flow. Vol. IX at 4769–70. The Altahama's estuary contains one-third of Georgia's coastal resource fisheries, a $430 million dollar industry. Vol. IX at 5085.

## B. The Section 404 Permit

HCA must obtain a Section 404 permit from the Corps, which will allow it to discharge fill materials into Tussahaw Creek in order to construct a dam. 33 U.S.C. § 1344(a), (f)(2). The National Environmental Policy Act ("NEPA") requires the Corps to consider whether its action would significantly affect the quality of the human environment before issuing the permit. 42 U.S.C. § 4332(2)(c).

On June 5, 2000, HCA submitted its application for a Section 404 permit to the Corps, and on December 27, 2000, a Joint Public Notice of HCA's permit application was issued. Vol. I at 168; Vol. V at 2512. HCA conducted two public hearings on the Reservoir and the Section 404 permit. The Corps held no additional public hearings. Vol. V at 2443.

Several parties objected to the permit. The U.S. Environmental Protection Agency ("EPA") expressed concerns regarding downstream water quality, whether the proposed mitigation for the site is ade-quate, sufficiently detailed, and enforceable, and whether a comprehensive EIS would be appropriate considering other pending permits. The EPA recommended the Corps deny the permit. *Id.* at 2520, 2534, 2535, 2538–39; Vol. II at 473, 479.

The U.S. Fish and Wildlife Service ("FWS") also questioned whether the several pending reservoir projects could result in significant impacts on aquatic environments. *Id.* at 2542, 2546. The FWS recommended the permit be denied and a programmatic assessment be conducted of the pending permits in north Georgia. Vol. II at 498, 500.

As required by NEPA, the Corps conducted an Environmental Assessment ("EA") to determine whether the environmental impacts of the Reservoir would be significant. If significant, NEPA requires a more in depth Environmental Impact Statement: if not, the Corps may issue a Finding of No Significant Impact ("FONSI"), and nothing further would be required under NEPA.

On September 27, 2002, the Corps completed an EA for the Reservoir, found no significant environmental impact, and issued a FONSI. On the same day, the Corps also issued a draft Section 404 permit to HCA which imposed mitigating conditions on the Reservoir's construction. HCA accepted the permit and the conditions, and the Corps issued the Section 404 permit on October 23, 2002. Vol. V at 2782; Vol XII at 6818.

On January 22, 2003, Plaintiffs, the Georgia River Network and Altahama Riverkeepers, filed this action to enjoin the Corps from issuing the Section 404 permit until the Corps completes an EIS. HCA successfully intervened in the action as a defendant.

As a consequence of the lawsuit, the Corps suspended the Section 404 permit to

review the cumulative impacts of previously permitted reservoirs and existing dams in the Ocmulgee River Basin. Vol. XII at 6745. The administrative record and EA omitted specific information on these impacts. *Id.* After review, the Corps issued a supplemental EA and FONSI, again concluding that an EIS is unnecessary. On May 9, 2003, the Corps reissued the Section 404 permit. Vol. XII at 7061.

### C. Plaintiffs' Claims

Plaintiffs claim the Corps violated NEPA by failing to adequately address the significant environmental impacts of the reservoir through an EIS. 42 U.S.C. §§ 4321 *et seq.* Plaintiffs also claim that the Corps violated CWA because, without an EIS, the Corps could not make a reasoned determination whether the Reservoir was the least damaging alternative to fulfill the future water needs of Henry County. 33 U.S.C. §§ 1251 *et seq.* As a result, Plaintiffs claim the Corps' actions under both the CWA and NEPA are arbitrary and capricious under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2)(A). Finally, Plaintiffs allege the Corps failed to give correct notice of the permit issuance as required by federal regulations. *See* 40 C.F.R. §§ 1501.4, 1506.6, 33 C.F.R. §§ 230.10, 230.11, and 325.2(a)(8).

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure defines the standard for summary judgment: Courts should grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." Where an action is brought pursuant to the APA, "[t]he focal point for judicial review of an administrative agency's action should be the administrative record." *P.E.A.C.H., Inc. v. U.S. Army Corps of Engineers,* 87 F.3d 1242,

1246 (11th Cir.1996)(citing *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)). In this case, no one contends the material facts are in dispute or that the Court needs to go beyond the administrative record. *Id.* at 1246. As such, this case must be resolved on the facts contained in the administrative record.

The appropriate standard for review of the Corps' decision concerning an EIS is "arbitrary and capricious." 5 U.S.C. § 706(2)(A); *Marsh v. Oregon Nat'l Resources Council,* 490 U.S. 360, 375–76, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Hill v. Boy,* 144 F.3d 1446, 1450 (11th Cir. 1998)("We review an agency's decision not to prepare an EIS under an 'arbitrary and capricious' standard.") The arbitrary and capricious standard requires the Court to consider whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851; *North Buckhead Civic Ass'n v. Skinner,* 903 F.2d 1533 (11th Cir.1990).

Although the enquiry into the facts is to be searching and careful, the court cannot substitute its judgment for that of the agency's. *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814. Where the issues involved require a high level of technical expertise, they are properly left to the agency's informed discretion. *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) ("Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately."); *Coalition on Sensible Transportation, Inc. v. Dole,* 826 F.2d 60, 66 (D.C.Cir.1987)("The NEPA process involves an almost endless series of judgment calls.... The line-

drawing decisions necessitated by this fact of life are vested in the agencies, not the courts.").

## III. NATIONAL ENVIRONMENTAL POLICY ACT

### A. NEPA's Requirements Pertaining to an EIS

The purpose of "NEPA is to require federal agencies to consider environmental values when making decisions [and][t]he initial responsibility of the federal agency is to determine the extent of the environmental impact." *Hill,* 144 F.3d at 1449 (citing *C.A.R.E. Now, Inc., v. Federal Aviation Admin.,* 844 F.2d 1569, 1572 (11th Cir.1988)). NEPA requires federal agencies prepare an EIS when a major federal action significantly affects the quality of the human environment. 42 U.S.C. § 4332(2)(c). The Council on Environmental Quality has issued NEPA regulations to aid federal agencies in determining when an EIS is required, *Hill,* 144 F.3d at 1449–50, and these regulations are afforded substantial deference. *Marsh,* 490 U.S. at 372, 109 S.Ct. 1851.

 The CEQ Regulations require agencies to prepare an EA in order to determine if the project's effect on the human environment is significant. *Hill,* 144 F.3d at 1450. The EA should provide sufficient evidence and analysis to determine whether an EIS is necessary. The EA will either conclude (1) an EIS is necessary or (2) with a finding of no significant impact ("FONSI") and no further study of environmental consequences is necessary. *Id.* "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

 Even though the agency's decision is entitled to deference, the Court must ensure that the agency took a "hard look" at the environmental consequences of a proposed action. *Sierra Club v. U.S. Army Corps of Engineers,* 295 F.3d 1209, 1216 (11th Cir.2002). The Eleventh Circuit has adopted a four-part test to determine whether an agency's decision not to prepare an EIS is arbitrary and capricious. First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem, it must take a "hard look" at that problem when preparing the EA. Third, the agency must make a convincing case for a finding of no significant impact. Fourth, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum. *Hill,* 144 F.3d at 1450.

 Under the CEQ regulations, an agency must consider the direct, indirect, and cumulative impacts on the environment when determining whether a federal action is "significant." 40 C.F.R. §§ 1508.8, § 1508.27(b). Relying on the test in *Hill v. Boy,* Plaintiffs argue as follows: (1) the Corps failed to demonstrate HCA's mitigation reduces the direct impacts below the significance threshold; (2) the Corps did not make a convincing case for the FONSI in light of the cumulative impacts; and (3) the Corps did not take a hard look at the indirect impacts. Plaintiffs have the burden of proof on each of these arguments. *Druid Hills Civic Ass'n v. Fed. Highway Admin.,* 772 F.2d 700, 709 n. 9 (11th Cir.1985).

### B. Direct Impacts

1. **The Direct Impacts on the Environment as a Result of the Reservoir**

Direct impacts [2] "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8. To minimize these impacts, HCA developed a mitigation plan which is mandatory as a condition of the Section 404 permit. Vol. XII at 6840. In its EA, the Corps identified the relevant direct impacts and reached the following conclusions.

### i. Wetlands Loss

The Reservoir will drown 252 acres of wetlands, but as compensation, HCA will restore 259 acres of wetlands, preserve another 317 acres, and provide a 63 acre buffer around these wetlands as protection. Vol. XII at 6840. All mitigation will occur in the Upper Ocmulgee Basin. *Id.* at 6855. The Corps determined the mitigation will replace the majority of lost wetlands functions so the direct impact from wetlands loss would not be significant.

### ii. Stream Inundation and Fragmentation [3]

The Corps identified the drowning of stream and stream fragmentation as relevant direct impacts. The Reservoir will drown 90,200 linear feet, roughly 17 miles, of stream. Vol. XII at 6840. However, this only represents 0.038% of the Ocmulgee Watershed. *Id.* at 6850. As mitigation, in the Upper Ocmulgee River Basin, HCA will preserve or enhance 125,000 feet of stream, restore another 10,900 feet, and maintain 292 acres of riparian buffer. *Id.* at 6840, 6842, 6855.[4] In addition, the Corps determined the fragmentation

caused by the Reservoir is not significant because it lies upstream from Lloyd Shoals Dam which has already fragmented the Tussahaw directly below the proposed dam. Vol. V at 2544; Vol. XII at 6854.

### iii. Aquatic Species and Wildlife Habitat

The Corps also considered the direct effects on wildlife. The Reservoir will drown 1,477 acres of open and forested land, considered valuable wildlife habitat. *Id.* at 6844. The Corps determined that, although the mitigation is tailored to wetland and stream restoration, it would also partially mitigate wildlife habitat loss. In addition, HCA is required to maintain a 271 acre vegetated and undisturbed buffer around the Reservoir, which will also reduce the impacts on habitat. Vol. XII at 6837, 6844.

The Corps determined that the direct impacts on aquatic species will be limited to the five mile downstream stretch before Lloyd Shoals Dam. *Id.* at 6843. The Corps conducted an inventory of aquatic species in the relevant area. As a result, only eighteen common species of fish and one invasive mussel species would be affected, and the Reservoir would provide additional habitat for larger populations of more varied fish species resulting in a small net beneficial effect on fish populations. *Id.* On these grounds, the Corps determined the direct impacts on aquatic species was not significant.

---

2. The term "effect" and "impact" are used interchangeably under the CEQ regulations. 40 C.F.R. § 1508.8.

3. A reservoir "fragments" a stream by stopping all travel of aquatic species either upstream or downstream past the dam. In this situation, Lloyd Shoals has already fragmented the stream. Vol. XII. at 6854.

4. The applicant requested a modification to this plan which would restore 268 acres of wetlands, preserve 334 acres, and include a 96 acre buffer. Similarly, 149,925 linear feet of stream and 442 acres of riparian buffer would also be mitigated. Vol. XII at 6840.

### iv. Water Quality and Quantity

Finally, the Corps considered the direct impacts on water quality and water quantity. All long term water quality impacts will be limited to the five mile stretch downstream before Lloyd Shoals Dam. *Id.* at 6838. As mitigation, the Reservoir must release a minimum flow of 2.5 M.D.G., which is referred to as "7Q10" flow. 7Q10 flow is the lowest flow occurring over a seven day period during an average ten years. *Id.* at 6845. The permit also requires that the reservoir vary the flow levels to more closely match downstream chemical and thermal characteristics. *Id.* at 6838, 6845.

The Corps also reasoned the Reservoir would have little impact on water quantity downstream from Lloyd Shoals Dam. Lloyd Shoals governs all releases downstream, and must release certain mandatory flows. Vol. XII at 6873. As such, the Corps found only in times of drought will the inflow from the Reservoir affect Lloyd Shoals Dam's outflow, causing a slight increase in duration and frequency of low flow releases. *Id.* On these grounds, the Corps determined the direct impacts on water quality and quantity would not be significant.

### 2. The Corps Decision is not Arbitrary or Capricious

#### i. The Corps Determination that Mitigation Reduces the Impacts to a Minimum

■ Plaintiffs argue HCA's mandatory mitigation does not sufficiently reduce the direct impacts to a minimum. Mitigation may reduce otherwise significant impacts to a minimal level. *See Hill*, 144 F.3d at 1450; *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 544–45 (11th Cir.1996); *CARE Now, Inc.*, 844 F.2d at 1575; *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 682–83 (D.C.Cir.1982). So long

as significant measures are taken to mitigate the project's effects, they need not completely compensate for the adverse environmental effects. *Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir.1993); *National Parks & Conservation v. Babbitt*, 241 F.3d 722, 734 (9th Cir.2001).

The Corps took a hard look at the effects of HCA's mitigation plan, which has been approved by the FWS. Vol. V. at 2538. The mitigation will erase the wetlands losses, improve more stream than is impacted by the Reservoir, and reduce water quality impacts and the loss of wildlife habitat. These measures are mandatory and significant, even if they do not fully compensate for all losses. *Friends of the Payette*, 988 F.2d at 993. Moreover, the Corps has thoroughly explained how the mitigation will reduce the direct impacts. *E.g.*, XII at 6845 (describing spillway tower design that would allow the release of flow at four different levels and re-aerate the water). *See LaFlamme v. F.E.R.C.*, 852 F.2d 389, 400 (9th Cir.1988); *People ex rel. Van de Kamp v. Marsh*, 687 F.Supp. 495, 500–501 (N.D.Cal.1988).

The Corps also took a hard look at the unmitigated impacts. The Corps describes how the location of the Reservoir in relation to Lloyd Shoals Dam minimizes impacts on water quantity and stream fragmentation, and how the Reservoir may actually improve the fish variety and populations. Vol. V at 2547. Plaintiffs fail to identify anything from the record showing the Corps ignored a relevant environmental concern or made a plain error of judgment about the extent of the direct impacts. As such, the Corps' decision that mitigation reduces all direct impacts to a level that is not significant is neither arbitrary nor capricious.

### ii. Applicable Case Law Supports a Finding of No Significant Impact

The law cited by Plaintiffs actually supports the Corps decision of no significant impact. For example, in *Simmons v. Army Corps of Engineers* the district court determined an EIS was necessary for a reservoir because it would extirpate two threatened/endangered species, destroy eight miles of one of the last free flowing streams in southern Illinois, destroy wildlife habitat, and destroy several prehistoric and historic sites. *Simmons*, No. 91–4188–JLF, slip op. at 15–17 (S.D.Ill. Jun. 25, 1992). None of these factors are present in the instant case.

Similarly, in 53 Fed.Reg. 46656–01, the EPA considered whether to restrict the use of a site on the Ware River in Virginia to prevent the construction of a 1,217 acre reservoir. This reservoir involved the destruction of 425 acres of wetlands that would disconnect the entire wetland corridor and threaten the Chesapeake Bay ecosystem. Ware Creek also had high and irreplaceable resource values. Nothing in the record reveals the Reservoir will have a similar impact.[5]

### iii. Controversy Surrounding the Reservoir Does Not Require an EIS

Plaintiffs also contend the controversy surrounding the Reservoir requires an EIS.[6] Section 1508.27(b)(4) states that, "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial" is a factor to consider for significance. An action is highly controversial where there is a substantial dispute about the size, nature or effect of a federal action rather than the existence of opposition to a use. *Friends of the Earth, Inc. v. U.S. Army Corps of Engineers*, 109 F.Supp.2d 30, 43 (D.D.C. 2000).

To succeed on this argument, Plaintiffs must first demonstrate a substantial dispute concerning the size, nature, or effect of the proposed action; if so, the agency must consider the dispute and address the concerns in its final decision. *Indiana Forest Alliance, Inc. v. U.S. Forest Service*, 325 F.3d 851, 858 (7th Cir.2003). Although the negative comments expressed by the EPA and FWS, as well as other organizations and individuals, demonstrate a dispute concerning the Reservoir, the Corps responded to the concerns of the FWS and EPA extensively in its EA. Vol. V at 2513–52; Vol. XII at 6831. Thus, Plaintiffs fail on the second prong.

### C. Cumulative Impacts

■ A cumulative impact is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. Even a slight increase in adverse conditions that form the existing environmental context may threaten significant harm: "[o]ne more factory . . . may represent the straw that breaks the back of the

---

5. Plaintiffs also cite *Hill v. Boy*, 144 F.3d 1446 (11th Cir.1998), and *City of Alma v. United States*, 744 F.Supp. 1546 (S.D.Ga. 1990). Neither of these cases are applicable to the current situation.

6. Plaintiffs make the argument that the Reservoir is considered major under the Corps' own categorization scheme. (Pl.'s Mem. Mot. Summ. J. at 17.) However, the record reveals the Georgia Department of Natural Resources used the categorization scheme in the 1980s. Vol. XI at 6496, 6504.

environmental camel." *Hanly v. Klein-dienst,* 471 F.2d 823, 831 (2nd Cir.1972). As such, an agency's EA is required to give "a realistic evaluation of the total impacts and cannot isolate a proposed project, reviewing it in a vacuum." *Grand Canyon Trust v. F.A.A.,* 290 F.3d 339, 342 (D.C.Cir.2002).

### 1. The Corps' Analysis of the Cumulative Impacts of the Reservoir

The Scope of the Corps cumulative impacts analysis includes the Ocmulgee river-basin area, and, to a limited extent, the Oconee and Altahama watershed river basins. Vol. XII at 6848. The Corps identified the following as relevant environmental concerns: (1) wetlands; (2) streams; (3) aquatic species; (4) water quantity; and (5) water quality. *Id.*

#### i. Wetlands

For its analysis, the Corps first identified all the wetlands lost from current and proposed projects in the Upper Ocmulgee Basin, the Upper Oconee Basin, the Lower Ocmulgee Basin, Lower Oconee Basin, and the Altahama Basin. The Corps then considered the significance of the Reservoir's impacts when combined with these losses.

In the Upper Ocmulgee, a total of 14,000 acres of wetlands have been impacted, leaving 83,794 acres remaining. *Id.* at 6856. All pending projects, including the Reservoir, will impact an additional 325 acres. *Id.* at 6858–59. Thus far, the Corps has required 4,470 acres of mitigation in this Basin. *Id.* at 6855. The Upper Oconee has lost an estimated 7,544 acres of wetlands, leaving 43,592 acres of wetlands remaining. The Corps, however, has required 1000 acres of mitigation for past projects. *Id.* at 6856. Since 1990, the Lower Ocmulgee has lost 0.13% of its wetlands, and the Lower Oconee has lost 0.07% of its wetlands. *Id.* During the same time, 330 acres were lost out of 256,665 acres in the Altahama River Basin.

The Corps determined that cumulatively, in 1990, all basins of the Altahama had 1,049,755 acres of wetlands. Since that time, 2,777 acres of wetlands have been lost, for which the Corps required 9,751 acres of mitigation. *Id.* at 6858. Total documented impact to the Altahama River Basin is 2.1%. *Id.* In this context, the Corps found that 252 acres lost from the Reservoir would be minor in Henry and Butts County, negligible in the Ocmulgee River Basin, and, as such, the cumulative impact is not significant. *Id.* at 6859.

#### ii. Streams

The Corps used a three step process to analyze cumulative stream impacts. First, the Corps identified the stream loss in different basins. The Corps then identified the environmental consequences of stream impoundment. Finally, the Corps analyzed whether these environmental consequences were significant as a result of the Reservoir and other impoundments.

In the Upper Ocmulgee, the Corps estimates that all past and pending impoundments, whether or not permitted by the Corps, have impacted 12.5% of stream habitat, and the Reservoir itself impacts 0.23%. *Id.* at 6355. In the Upper Oconee River Basin, past, present and reasonably foreseeable projects have impacted 8.3% of stream length. *Id.* at 6853. An additional 370 impoundments occur in the lower Ocmulgee, lower Oconee, and Altahama Basins. *Id.* at 6855.

The Corps noted that such impoundments may cause shifts in the biological communities of streams, the fragmenting of streams, blocking the movement of aquatic species up and downstream, and alterations of sediment transport. *Id.* at 6854.

The Corps determined, however, that the proposed Reservoir, even considered with existing impoundments, will not result

in a significant cumulative effect. First, the Reservoir has no effect beyond Lloyd Shoals Dam because Lloyd Shoals has already fragmented the stream and disrupted the downstream flow of sediment. Second, the Reservoir will impact only an additional 0.23% of the stream length in Upper Ocmulgee Basin. *Id.* at 6854–55. Thus, the minor impacts added by the Reservoir, even in conjunction with all other proposed and current impoundments, are not significant. *Id.* at 6855.

### iii. Aquatic Species

The Corps determined that the cumulative effects of all current and proposed impoundments would be not be significant. The Corps offers two reasons for this decision. First, as described before, all direct impacts from the Reservoir terminate at Lloyd Shoals Dam. Only several common species of fish and one invasive mussel are impacted, and sufficient upstream habitat exists for riverine species. *Id.* at 6870

Second, the Corps conducted conservative modeling of water flow to determine whether the lower flow caused by the Reservoir would impact aquatic species. The modeling revealed that any impacts from low flow itself would be minimized by the mandatory 7Q10 releases from the Reservoir, and causes no impact to endangered species. *Id.* at 6870, 6872. Third, the Corps recognized pending water withdrawal permits may have an impact during low flow, but whether these permits will be issued is unknown, and the Georgia Environmental Protection Division intends to place more restrictive conditions on future permit water withdraws. Vol. XII at 6872.

### iv. Water Quantity

The Corps also determined that the cumulative effects of water withdrawal would not have a significant impact on water quality. *Id.* at 6878. The Corps offered three main reasons for this decision. First, more water is being discharged into the Upper Ocmulgee Basin than is being removed. *Id.* at 6874.

Second, the Reservoir's outflow into Jackson Lake has little effect on the amount of water released by Lloyd Shoals Dam downstream. Lloyd Shoals is required to release either 400 cubic feet per second (cfs) or inflow, and flows of 400 cfs have been exceeded 90 % of the time. *Id.* at 6873. As a result, the only time the Reservoir could impact outflow from the Lloyd Shoals Dam is during drought conditions. *Id.* The Corps' modeling of flow determined that even where the Reservoir's flow is half of normal, low flow releases from Lloyd Shoals would only slightly increase. *Id.* at 6873–74. In drought conditions, Tussahaw Creek's flow reaches zero, but the Reservoir is required to release at least 7Q10 flows. As a result, the Reservoir may increase the out flow from Lloyd Shoals Dam. *Id.* at 6872

Third, as a result of a drier climate, evaporation, and water consumption, the runoff rates into the Altahama River Basin have been reduced by 0.01 % (136 MDG). *Id.* at 6874. Modeling determined the Reservoir will reduce low term flows by 1.66% (28 MDG) or may actually increase flows by 2.99 % (34 MDG). *Id.* at 6874. Only in a worst case scenario were there any potential impacts, considering all water withdrawals from the system. *Id.* at 6878.

### v. Water Quality

In this analysis, the Corps assessed current problems and improvements in water quality in the Ocmulgee, Oconee, and Altahama River Basins, and then ran models on stream flow. As a result, the Corps determined that water quality would not be significantly effected by the cumulative impacts of current water impoundments.

First, conservative stream modeling identified only minor increases in pollutant

levels during low flow periods in the Ocmulgee River Basin. Otherwise, sufficient water remained available to dilute potential pollutant sources. *Id.* at 6861. Second, newly installed re-aeration features and a mandatory increase in release flows at Lloyd Shoals Dam will improve water quality downstream. Third, the Water Withdrawal Permit for the Reservoir requires development of a watershed protection plan and maintaining minimum releases of 7Q10. *Id.* at 6859.

The Corps also paid specific attention to potential impacts to water quality in the estuaries of the Altahama. *Id.* at 6868. Based on a worst case scenario model, the Corps determined that cumulative impacts could slightly affect the quantity of water in the estuary. *Id.* In addition, a study reviewed by the Corps determined all projects constructed since 1925 had not had an appreciable effect on discharge trends in the Altahama. *Id.* at 6869. Instead, the decline of the base flow conditions in the Altahama is a result of regional climate variability. *Id.*

### 2. The Corps Made a Reasonable Decision Concerning Cumulative Impacts

Plaintiffs raise two arguments concerning the Corps' analysis of cumulative impacts. First, Plaintiffs contend the Corps inappropriately isolated the effects of the Reservoir from all other effects. Second, Plaintiffs contend that the Corps failed to make a convincing case that the cumulative impacts are not significant.

First, the Corps appropriately considered the significance of the Reservoir's impacts when combined with the impacts of other impoundments throughout the Ocmulgee River Basin. *Grand Canyon Trust,* 290 F.3d at 345–46 (rejecting the F.A.A.'s analysis for failing to consider the increased noise of a new airport with all other noise impacts): *Town of Cave Creek*

*v. F.A.A.,* 325 F.3d 320, 328–29 (D.C.Cir.2003)(appropriate cumulative impacts analysis where the effects of aircraft noise were change the baseline ambient noise levels).

Second, the Court finds the Corps made a convincing case that an EIS is unnecessary because the cumulative impacts are not significant. A reasonable cumulative impacts analysis must include (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and reasonably foreseeable proposed—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate. *Grand Canyon Trust,* 290 F.3d at 345; *Stewart v. Potts,* 126 F.Supp.2d 428, 437 (S.D.Tex.2000).

Without question, the Corps has complied with the first four factors of *Grand Canyon Trust.* The Corps identified the scope of the review and all expected impacts as a result of the Reservoir. The Corps also identified other current and potential projects, such as the pending permits before GAEPD and the proposed Hard Labor Creek Reservoir in the Oconee Basin, and their expected impacts. Vol. XII at 6855, 6872. On the fifth prong, the Corps reasonably concluded that the cumulative impacts would be insignificant.

Plaintiffs contend that the cumulative impacts in and of themselves are significant. Plaintiffs point to the loss of 12.5 % of the stream in the Ocmulgee River Basin and the fragmentation of 51% of the Oconee River Basin. However, a percentage reduction, by itself, does not determine whether there has been a significant impact. *Stewart,* 126 F.Supp.2d at 437. At times "0.006% may be significant, while in

other cases 16% might be insignificant." *Id.* Nothing in the record identified by Plaintiffs translates these percentages of losses into environmental consequences to the Ocmulgee, Oconee, or Altahama. Instead, all evidence points the opposite direction: these cumulative impacts will not be significant.

Plaintiffs refer to one study conducted by the University of Georgia that describes, in general, environmental impacts that may result from reservoirs. Plaintiffs note the proliferation of impoundments in the Ocmulgee and Oconee and argue the result will be significant. Plaintiffs fail to demonstrate, however, these injuries are, in fact, occurring or will occur in the Altahama River Basin. Vol. XII at 5180. More significantly, the concerns raised by the study—stream fragmentation, water quality and threats to endangered species—were specifically addressed by the Corps in their cumulative impacts analysis.

"Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately." *Kleppe,* 427 U.S. at 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). In this situation, the Corps identified and gave a hard look at the appropriate environmental concerns, and has made a convincing case an EIS is unnecessary. *Hill,* 144 F.3d at 1450.

### D. A Comprehensive EIS

The question of whether an agency should perform a comprehensive EIS is one of scope. Daniel R. Mandelker. *NEPA: Law & Litigation,* § 9:1 (2nd ed.2002). While a cumulative effects analysis considers the combined effects of past, current, and proposed projects, a comprehensive EIS considers interrelated projects over a wider region.

■ Thus, a comprehensive EIS "is appropriate only where the proposal itself is regional or systemic in scope, or where the proposal is one of a series of interrelated proposals that will produce cumulative systemwide effects that can be meaningfully evaluated together." *Izaak Walton League of Am. v. Marsh,* 655 F.2d 346, 374 (D.C.Cir.1981). *See also Fritiofson v. Alexander,* 772 F.2d 1225, 1241 n. 10 (5th Cir.1985). Scope depends on the range of actions, alternatives, and impacts, 40 C.F.R. § 1508.25, and the decision to conduct a comprehensive EIS remains with the agency and is reviewed under the arbitrary and capricious standard. *Izaak Walton League of Am.,* 655 F.2d at 374 n. 73.

The Corps rejected conducting a comprehensive EIS because such an EIS is designed for large policy decisions that are fundamentally consistent across the board among similar projects under consideration. However, each individual reservoir proposal is significantly different regarding design, operation, and management, and are located in different environmental settings. Vol. V. at 2611–12. Instead, the Corps limited the scope of the review to the Ocmulgee, the Oconee, and the Altahama River Basin because none of the direct effects of the Reservoir would be felt past Lloyd Shoals Dam, and actions taken in the Upper Ocmulgee Basin would be sufficiently similar in location, topography, watershed impacts, and habitat types to be considered together. Vol. XII at 6848–50.

Plaintiffs contend a comprehensive EIS is necessary because the reservoirs throughout northern Georgia are actions that "when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(2). *Kleppe v. Sierra Club,* 427 U.S. 390, 409, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)(NEPA "may require a comprehensive impact statement in certain situations where several proposed actions are pending at the same time.").

■ The Corps' decision not to prepare a comprehensive EIS for all of north Georgia is reasonable on three grounds.

First, whether to conduct a comprehensive EIS is a question of scope, yet Plaintiffs never challenge the Corps decision to limit the analysis of the Reservoir to the Ocmulgee, and to a certain extent Oconee and Altahama. Identification of the geographic area for an environmental assessment "is a task assigned to the special competency of the appropriate agencies," *Kleppe*, 427 U.S. at 414, 96 S.Ct. 2718.

Second, the reservoirs are not part of a regional plan or program. *Izaak Walton League of Am. v. Marsh*, 655 F.2d at 374. Each north Georgia reservoir project is proposed and funded separately and has independent utility, and "[a]lthough there is substantial movement by state agencies and working groups of the Georgia legislature to manage water resources on a watershed and river basin basis...policy has yet to be implemented." Vol. XII at 6847.[7] The regional water studies conducted by the Corps do not convert the disparate reservoirs into a "program" of development. *Kleppe*, 427 U.S. at 403–04, 96 S.Ct. 2718.

Third, nothing in the record reveals the forty-two reservoir proposals [8] have such a cumulative impact on a discrete area as to make the Corps decision to limit its analysis to a river basin arbitrary and capricious. *Natural Resources Defense Council, Inc. v. Callaway*, 524 F.2d 79, 89–90 (2nd Cir.1975)(finding several similar dredging products that dumped spoil in one particular area of Long Island Sound

required a comprehensive EIS); *Sierra Club v. Penfold*, 664 F.Supp. 1299, 1303 (D.Alaska 1987)("Dozens of small operations of a single type incrementally contribute to deterioration of water quality in a common drainage stream.") In addition, the reservoirs lie in different river basins, and the Corps has decided that a river basin analysis is sufficient to adequately address all cumulative effects. *See Kleppe*, 427 U.S. at 414, 96 S.Ct. 2718 ("Even if environmental interrelationships could be shown conclusively to extend across basins and drainage areas, practical considerations...might well necessitate restricting the scope of comprehensive statements.")

No reasonable person can disagree with Plaintiffs that some comprehensive consideration of the use of water resources in north Georgia should be considered. Plaintiffs, however, may have chosen the wrong reservoir at the wrong place to use NEPA as the tool to accomplish this goal. Furthermore, as recognized by the Corps, the issue may more directly involve allocation of resources than effect on the environment. As discussed below, this is a matter specifically left to the states. *See* 33 U.S.C. § 1261(g).

### E. Indirect Impacts from the Reservoir

■ Whether the Corps can consider the indirect growth related impacts of the Reservoir is the subject of HCA's motion to dismiss. HCA argues that the Corps is barred from considering the impacts of

---

7. Plaintiffs makes the novel argument that Georgia's absence of a regional water plan is a systematic plan to leave water development to local governments. However, no evidence in the record supports the argument that this was a deliberate action on the State's part.

8. Although all parties have been referring to "forty-two" reservoir projects as if all of these

were before the Corps for permitting purposes. This is not accurate. Four of the permits have been withdrawn or are not active, and there is only one pending application in the Oconee, but no pending permits in either the Ocmulgee or Altahama River Basins. Vol. XII at 6849.

growth due to the Reservoir because water allocation is solely within the State of Georgia's power. Plaintiffs contend the consideration of indirect impacts does not interfere with water allocation and the Corps failed to take a hard look at the consequences of growth in Henry County. This Court first turns to HCA's Motion to Dismiss.

### 1. Motion to Dismiss

 The CEQ NEPA regulations define indirect effects as "later in time or father removed in distance, but are reasonably foreseeable," and include "induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems." 40 C.F.R. § 1508.8(b). *See also* 33 CFR § 230.4. Thus, NEPA requires agencies to consider the significance of growth induced by the federal action. *City of Davis v. Coleman,* 521 F.2d 661, 674–676 (9th Cir.1975); *C.A.R.E. Now, Inc.,* 844 F.2d at 1574–75; *National Wildlife Federation v. Coleman,* 529 F.2d 359, 374 (5th Cir.1976); *TOMAC v. Norton,* 240 F.Supp.2d 45, 50–52 (D.D.C.2003): *Mullin v. Skinner,* 756 F.Supp. 904, 921 (E.D.N.C. 1990).

HCA does not dispute this, but contends that under the Wallop Amendment to the CWA, the Corps is without jurisdiction to consider the growth impacts of the Reservoir because this would trespass on the State's prerogative to make water allocation decisions. *See* 33 U.S.C. § 1251(g).

The purpose of analyzing the indirect impacts of the Reservoir is to determine whether an EIS must be performed, not whether the State made a proper water allocation decision. "[I]t is well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

As such, even if the Corps had determined the growth of Henry County as a result of the Reservoir was significant, this in no way interferes with the State's decision that water must be allocated to Henry County or whether the Reservoir is the appropriate method of allocation. *Id.* ("[T]he agency is not constrained by NEPA from deciding other values outweigh the environmental costs.") Therefore, HCA's Motion to Dismiss is **DENIED.**

### 2. Did the Corps Take a Hard Look at the Indirect Impacts?

 As mentioned above, indirect impacts are reasonably foreseeable impacts that are later in time and farther removed in distance from direct impacts. 40 C.F.R. § 1508.8(b). Plaintiffs contend the Corps failed to take the requisite hard look at indirect impacts because it did not adequately address the effect of doubling the water supply on growth in Henry County as a whole or around the Reservoir.

First, the Corps is required only to look at the indirect impacts that would result from the Reservoir itself. In *C.A.R.E. Now,* the Eleventh Circuit analyzed the cumulative direct and *indirect* effects of extending an airport runway. 844 F.2d at 1574–75. The court reasoned, "an increase in capacity is *inevitable* at PDK given the projected growth of Atlanta and the strain on Atlanta's Hartsfield International. This increased growth at PDK is *not attributable* to an extended runway." *Id.* at 1575 (emphasis added). The record shows that the purpose of the reservoir is to keep up with the water demands of Henry County's increasing population, not that the projected population growth rate is attributable to the construction of this Reservoir. Vol. V at 2509. As such, the Corps was not required to look at the environmental consequences of Henry

County's population growth. *C.A.R.E.*, 844 F.2d at 1575; *Town of Orangetown v. Gorsuch*, 718 F.2d 29, 38 (2nd Cir.1983)("Appellant has not established that expansion of the sewage treatment system will encourage a significant increase in development rather than merely meet the district's presently overburdened needs and anticipated growth."); *City of Davis*, 521 F.2d at 675 ("The growth-inducing effects of the Kidwell Interchange project are its raison d'etre.")

Second, the Corps did review the foreseeable development around the Reservoir, which would result in an increase of infrastructure and utilities. Vol. XII at 6879. The Corps noted most of the population growth would occur at Stockbridge and McDonough, not around the Reservoir. The Corps also reviewed Henry County's "Land Use Element" which outlines the plans for land use through 2010. Under this plan, most commercial and industrial development will be around the cities and major transportation corridors. Moreover, the Corps noted that the Reservoir is protected by a buffer, and any disturbance would require State permission. Any development impacting aquatic sites would require a Section 404 permit. Thus, any indirect effects associated with infrastructure development would be minimized by local, state, and federal levels, where regulations require assessment and compensation for impacts. *Id.*

Although Plaintiffs contend the Corps needs to discuss more fully the impacts from development around the Reservoir, any further analysis would be speculative. Nothing on the record reveals any plans or proposals to develop the lands around the Reservoir. *See Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs.*, 109 F.Supp.2d 30, 41 (D.D.C.2000) (indirect impacts must be reasonably foreseeable to require an assessment); *City of Davis*, 521 F.2d at 668 (EIS required for

indirect impacts where the Solano County Development Agency had begun promoting a 150 acre "University Research Park"); *TOMAC*, 240 F.Supp.2d at 50–52 (EIS required where proposed Indian Casino would bring (1) 5,600 permanent jobs, (2) a population increase of 1,200, and (3) a potential for increased commercial development); *Hoosier Environmental Council, Inc. v. U.S. Army Corps of Engineers*, 105 F.Supp.2d 953, 979 (S.D.Ind.2000)(allegations that development would occur, absent some evidence that a concrete development was being contemplated was speculative).

In light of the uncertainty as to the type of development that may occur around the Reservoir, the Corps reliance on local, state and federal regulations is not unreasonable. Henry County's land use plan specifically addresses handling and controlling the impacts of future growth, and the Corps placed mandatory mitigation requirements on the Section 404 permit to minimize impacts expressly around the Reservoir. *See City of Carmel–By–The–Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1162 (9th Cir.1997)("[t]he construction of the Hatton Canyon freeway will not spur on any unintended, or more importantly, unaccounted for, development because local officials have already planned for the future use of the land."). Anything beyond these considerations is speculation. As Justice Powell commented in the *Kleppe* opinion, "... it is impossible to predict the level of inactivity that will occur in the region.... and thus impossible to analyze the environmental consequences, and the resource commitments involved in, and the alternatives to, such activity." *Kleppe* at 402, 96 S.Ct. 2718.

As such, the Corps took a hard look at the indirect effects of growth around the Reservoir. The Corps did not consider any inappropriate factors and Plaintiffs fail

to identify any important aspect that was overlooked. *Sierra Club*, 295 F.3d at 1216. Moreover, the Corps explanation was reasonable and not contrary to the evidence.

## IV. THE 404 PERMIT UNDER THE CLEAN WATER ACT

Plaintiffs contend that a proper NEPA review is necessary for a valid 404 permit, and "[f]or all the same reasons the NEPA analysis is fatally flawed, the Corps' permit for the ... Reservoir also violates Section 404 of the Clean Water Act." (Pl.'s Mem. Mot. Summ. J. at 36.) Except for NEPA, Plaintiffs offer no other grounds for invalidating the permit under the Clean Water Act. As the Corps decision to issue an EA and FONSI is neither arbitrary and capricious, Plaintiffs' claims under the CWA also fail.

Furthermore, with regard to Plaintiffs' request to enjoin the specific permit under Section 404 for the Tussahaw Reservoir, in view of the lack of any direct significant environmental harm, Plaintiffs will suffer no irreparable harm from the issuance of the permit. Defendant HWA will suffer irreparable harm from enjoining the permit. See *Kleppe*, 427 U.S. at 407, 96 S.Ct. 2718.

## V. NOTICE

Plaintiffs contend that the Corps's violated regulations regarding notice of the Section 404 permit. Plaintiffs, however, are without standing to pursue this claim because they have suffered no injury from the delay. While a plaintiff suffers an injury in fact when he or she "fails to obtain information which must be publically disclosed pursuant to statute," *Federal Election Com'n v. Akins*, 524 U.S. 11, 21, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998), the plaintiffs are not injured where they receive actual notice. *Central Arizona Irrigation & Drainage Dist. v. Lujan*, 764 F.Supp. 582, 595 (D.Ariz.1991). Plaintiffs submit no evidence that they did not receive actual notice despite the delay or that they suffered any injury as a result. As such, Plaintiffs' Motion for Summary Judgment is **DENIED.**

## VI. CONCLUSION

As the Corps decision to issue an EA and FONSI are neither arbitrary nor capricious, Plaintiffs' Motion for a Preliminary Injunction [# 2–1], Plaintiffs' Motion for a Temporary Restraining Order [# 10–1], and Plaintiffs' Motion for Summary Judgment [# 42–1] are **DENIED.** Intervenor's Motion to Partially Dismiss Plaintiffs' Complaint [# 30–1] is also **DENIED,** and Intervenor's Motion for Expedited Briefing on the Preliminary Injunction Motion [# 31–1] is **DENIED as moot.** Intervenor's Motion for Leave to File a Post Argument Memorandum [# 56–1] and Defendant's Motion to File in Excess Pages [# 59–1] are **GRANTED nunc pro tunc.**